[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11347
_____

D.C. Docket No. 7:17-cv-00131-RDP


RODNEY KEISTER,

Plaintiff-Appellant,

versus

STUART BELL,
in his official capacity as President of the University of Alabama,
JOHN HOOKS,
in his official capacity as Chief of Police for the University of Alabama Police
Department,
MITCHELL ODOM,
in his official capacity as Police Lieutenant for the University of Alabama Police
Department,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(January 23, 2018)

Before ED CARNES, Chief Judge, and BLACK, Circuit Judge, and MAY,[*] District Judge.

MAY, District Judge:

Rodney Keister appeals the district court's denial of a preliminary injunction. Mr. Keister sought to enjoin University of Alabama ("UA") officials from applying UA's grounds use policy to the intersection of University Boulevard and Hackberry Lane. Application of this grounds use policy prevents him from speaking on UA's campus unless he complies with its terms. Because the district court properly found the intersection is a limited public forum within UA's campus, we affirm.

## I. BACKGROUND

Mr. Keister is a traveling Christian evangelist who claims he is called to publicly share his religious beliefs throughout the country. Mr. Keister typically shares his beliefs on public sidewalks by preaching, passing out gospel tracts, and having one-on-one conversations and praying with passers-by. Because he desires to reach young people, Mr. Keister routinely visits college and university campuses.

---

[*] Honorable Leigh Martin May, United States District Judge for the Northern District of Georgia, sitting by designation.

On March 10, 2016, Mr. Keister went to UA, a state-funded public university located in Tuscaloosa, Alabama, to share his beliefs. Around 4 p.m. that afternoon, Mr. Keister and his friend—neither of whom are UA students, faculty, nor employees—began to preach using a loudspeaker, held up a banner, and passed out religious literature on a sidewalk adjacent to 6th Avenue on UA's campus. This sidewalk is near Smith and Lloyd Halls and across the street from the Quad—a well-traveled, wide-open grassy field surrounded by UA buildings. Shortly after they began, Mr. Keister and his friend were approached by two UA police department officers and UA official Donna McCray,[1] who advised them that they would be unable to speak at that location because they did not have a Grounds Use Permit ("GUP") as required by UA's Policy for the Use of University Space, Facilities and Grounds ("grounds use policy"). They advised that the grounds use policy required 10 working days advance notice and university organization sponsorship.

Because Mr. Keister and his friend had not obtained a GUP, they moved to the intersection of University Boulevard and Hackberry Lane ("the intersection") to continue preaching and passing out literature. Mr. Keister contends he was told to go to that location by a UA police supervisor who advised him, "On that corner,

---

[1] Ms. McCray is the Senior Director of Facilities Operation and Grounds Use Permits at UA.

you're good." Mr. Keister also thought that the intersection appeared to be a public city sidewalk as opposed to a part of UA's campus.

Not long after Mr. Keister and his friend moved locations, they were again met by UA police. The police advised them that the intersection and sidewalk *were* part of UA's campus, and the grounds use policy would also apply to the intersection. Fearing arrest for criminal trespass, Mr. Keister and his friend left.

A. THE INTERSECTION



Mr. Keister admits that the intersection lies within the bounds of UA's campus, and the district court determined that it is in the "heart" of the UA campus. While the two streets that form that intersection run through much of

UA's campus, University Boulevard and Hackberry Lane are public Tuscaloosa streets which extend beyond the UA campus perimeter. Sidewalks run alongside these two streets both within and outside the UA campus, and UA's campus is not fenced off, gated, or otherwise self-contained to prevent public access. However, within the campus (including at the intersection), landscaping fences line the sidewalks, street signs bear the script "A" UA logo, and UA signs hang from streetlamps. Some of the city's transportation grid also runs through campus.

Visible from the intersection are numerous UA facilities and landmarks. The intersection is approximately one block from the Quad. Russell Hall sits prominently at the northeast corner, where Mr. Keister was preaching. Gallalee Hall and a UA parking lot with a sign restricting its use to UA faculty and staff occupy the northwest corner. The southwestern corner includes Farrah Hall and its adjacent UA-only parking lot. A park sits at the southeastern corner, which ultimately connects to the campus Episcopal ministry building further south on Hackberry Lane. About a block away from the intersection on one side of University Boulevard there are private businesses interspersed among UA buildings.

B. UA'S GROUNDS USE POLICY

UA's grounds use policy is intended to provide access to UA grounds while upholding the "primacy" of UA's "teaching and research mission," including to

"facilitate responsible stewardship of institutional resources and to protect the safety of persons and the security of property." The grounds use policy governs when, where, and how those who are unaffiliated with UA may speak publicly on campus. It specifically includes UA sidewalks within its auspices.

To obtain approval to speak publicly at UA, an unaffiliated potential speaker must: (1) be sponsored by or affiliated with a UA department or registered student organization; and (2) fill out a GUP form. GUP forms must be submitted at least 10 working days prior to an intended event, unless the intended event is "spontaneous," in that it is "occasioned by news or issues coming into public knowledge with[in] the preceding two (2) calendar days," or it is a "counter-event," meaning that it is in response to an event for which a GUP has already been issued. For either of those exceptions, UA will attempt to accommodate the request within 24 hours.

The stated purpose of the required lead-time is to facilitate review by all UA departments that would be responsible for aspects of an event, such as UA police, food service, and electrical service. If the intended event does not require multiple UA department approvals, UA may issue its approval in as few as three days' time.

Once a GUP form is submitted, UA will approve the application unless one of the following conditions are present:

a) The applicant, if a student or a recognized student organization, is under a disciplinary penalty withdrawing or restricting privileges

6

made available to the student or a recognized student organization[], such as use of a facility.

b) The proposed location is unavailable at the time requested because of events previously planned for that location.

c) The proposed date or time is unreasonable given the nature of the Event and the impact it would have on University resources.

d) The Event would unreasonably obstruct pedestrian or vehicular traffic.

e) The Event would prevent, obstruct, or unreasonably interfere with the regular academic, administrative, or student activities of, or other approved activities at, the University.

f) The Event would constitute an immediate and actual danger to University students, faculty, or staff, or to the peace or security of the University that available law enforcement officials could not control with reasonable effort.

g) The University Affiliate on whose behalf the application is made has on prior occasions:

1) Damaged University property and has not paid in full for such damage, or
2) Failed to provide the designated University official with notice of cancellation of a proposed activity or Event at least two (2) University working days prior to a scheduled activity or Event.

If an application is denied, the grounds use policy also sets out an appeal process.

## C. RELEVANT PROCEDURAL HISTORY

On January 25, 2017, Mr. Keister filed this action in the Northern District of

Alabama under 42 U.S.C. §§ 1983 and 1988, asserting UA's grounds use policy

violates the First Amendment's free speech clause and the Fourteenth

Amendment's due process clause. [2] The next day, Mr. Keister filed a Motion for Preliminary Injunction, contending that UA's ground use policy violates the First Amendment and UA officials should be enjoined from enforcing UA's policy because the intersection is a traditional public forum and UA's policy fails scrutiny. After a hearing on the matter, the district court denied Mr. Keister's motion. Among other reasons, it found that the intersection was a limited public forum and the grounds use policy met the lower level of scrutiny required. This appeal followed.

## II. STANDARDS OF REVIEW

We generally review for an abuse of discretion a district court's preliminary injunction denial, but review *de novo* the district court's underlying legal conclusions. ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd., 557 F.3d 1177, 1198 (11th Cir. 2009) [hereinafter "ACLU"]. "Ordinarily, we review district court factfindings only for clear error, but First Amendment issues are not ordinary." Id. at 1203. "Where the First Amendment Free Speech Clause is involved our review of the district court's findings of 'constitutional facts,' as distinguished from

---

[2] In a footnote, Mr. Keister raises in passing that the ground use policy is unconstitutionally vague in violation of the Fourteenth Amendment. However, we need not address this argument because Mr. Keister has not properly raised the issue on appeal and it is therefore waived. See Old W. Annuity & Life Ins. Co. v. Apollo Grp., 605 F.3d 856, 860 n.1 (11th Cir. 2010) ("Although Coast mentions the lack of supporting pleading in a footnote in its appellate brief, Coast has not presented substantive argument on this point on appeal; the issue is therefore waived.").

ordinary historical facts, is *de novo.*" Booth v. Pasco Cty., 757 F.3d 1198, 1210

(11th Cir. 2014) (quoting ACLU, 557 F.3d at 1203).

> Historical facts "are facts about the who, what, where, when, and how
> of the controversy," and we review them for clear error. "By contrast,
> under the assumptions about the law that we [make] for purposes of
> deciding this case, we must determine the 'why' facts. Those are the
> core constitutional facts that involve the reasons the [defendant] took
> the challenged action."

Flanigan's Enters. Inc. of Ga. v. Fulton Cty., 596 F.3d 1265, 1276 (11th Cir. 2010)

(internal citations omitted) (quoting ACLU, 557 F.3d at 1206).[3]

To receive a preliminary injunction, the plaintiff must clearly establish the

following requirements: "(1) a substantial likelihood of success on the merits; (2) a

substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff

outweighs the potential harm to the defendant; and (4) that the injunction will not

disserve the public interest." Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir.

2002) (citing Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1265 (11th

Cir. 2001)).

"A preliminary injunction is an extraordinary and drastic remedy not to be

granted unless the movant clearly establishes the burden of persuasion as to the

---

[3] The parties dispute whether the district court's finding that the intersection is in the "heart of
the campus" is a historical fact or a constitutional fact. Mr. Keister argues that although the
intersection is technically "where" the event occurred, because that fact is so crucial to the
ultimate constitutional analysis, this Court must review *de novo* the district court's finding that
the sidewalk's location is within campus. However, we need not decide that question. Under
either standard of review—clear error or *de novo*—it is apparent that the intersection is indeed
within the heart of UA's campus.

four requisites." <u>ACLU</u>, 557 F.3d at 1198 (quoting <u>All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.</u>, 887 F.2d 1535, 1537 (11th Cir. 1989)). If Mr. Keister is unable to demonstrate a substantial likelihood of success on the merits, we do not need to address the remaining preliminary injunction requirements. <u>Bloedorn v. Grube</u>, 631 F.3d 1218, 1229 (11th Cir. 2011).

## III. DISCUSSION

Mr. Keister contends that the district court erred in finding the intersection is a limited public forum, arguing that it is instead properly classified as a traditional public forum. This distinction matters because the type of forum determines the level of scrutiny applied. <u>Id.</u> at 1230 ("[T]he degree of scrutiny we place on a government's restraint of speech is largely governed by the kind of forum the government is attempting to regulate.").[4]

---

[4] Notably, Mr. Keister did not argue on appeal that the policy could not survive scrutiny if the district court correctly found the intersection was a limited public forum. <u>See</u> <u>Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez</u>, 561 U.S. 661, 679 (2010) (noting that speech restrictions within a limited public forum are permitted when the restrictions are "reasonable and viewpoint neutral"). While this Court does have some concerns about whether UA's 10 working day advance notice requirement would be reasonable for events that do not require multiple department approvals, because Mr. Keister did not raise that issue in his initial brief, we have no occasion to address it here. <u>Access Now, Inc. v. S.W. Airlines Co.</u>, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

As a preliminary matter, the First Amendment does not guarantee access to property merely because the government owns it. Id. (citing Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 803 (1985)). Rather, courts use "'forum analysis' to evaluate government restrictions on purely private speech that occurs on government property." Walker v. Tex. Div. Sons of Confederate Veterans, Inc., 576 U.S. ___, 135 S. Ct. 2239, 2250 (2015) (citing Cornelius, 473 U.S. at 800).

The Supreme Court has recognized four categories of government fora: the traditional public forum; the designated public forum; the limited public forum; and the nonpublic forum. Barrett v. Walker Cty. Sch. Dist., 872 F.3d 1209, 1224 (11th Cir. 2017). The parties agree there are only two possible fora at issue here: the traditional public forum and the limited public forum.

A traditional public forum is government property which "ha[s] immemorially been held in trust for the use of the public, and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983) (quoting Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939)). The Supreme Court has restricted traditional public forum status to its "historic confines." Walker, 135 S. Ct. at 2250 (quoting Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 678 (1998)).

11

Quintessential examples are parks and streets. Barrett, 872 F.3d at 1224. "[A] time, place, and manner restriction can be placed on a traditional public forum *only* if it is content neutral, narrowly tailored to achieve a significant government interest, and 'leave[s] open ample alternative channels of communication.'" Bloedorn, 631 F.3d at 1231 (quoting Perry, 460 U.S. at 45).

In contrast, a limited public forum is established when governmental entities open their property but limit its use to "certain groups or dedicate[] [it] solely to the discussion of certain subjects." Christian Legal Soc'y, 561 U.S. at 679 n.11 (quoting Pleasant Grove City v. Summum, 555 U.S. 460, 470 (2009)). It is plain that governments may exclude a speaker "if he is not a member of the class of speakers for whose especial benefit the forum was created." Cornelius, 473 U.S. at 806 (citing Perry, 460 U.S. at 49). "Indeed, implicit in the idea that a government forum has not been opened widely and intentionally to the general public is the government's right to draw distinctions in access based on a speaker's identity." Bloedorn, 631 F.3d at 1235 (citing Perry, 460 U.S. at 49). Limitations made in a limited public forum need to be only "reasonable and viewpoint neutral." Id. at 1231.

We have also made clear that "[t]he physical characteristics of the property alone cannot dictate forum analysis." Id. at 1233. "Instead, we look to the traditional uses made of the property, the government's intent and policy

12

concerning the usage, and the presence of any special characteristics." Id. "[T]he scope of the relevant forum is defined by 'the access sought by the speaker.'" Id. at 1232 (quoting Cornelius, 473 U.S. at 801). As Mr. Keister solely seeks to speak at the intersection, that is the scope of our forum assessment today.

Mr. Keister contends that the intersection is a traditional public forum because: (1) it is a sidewalk bordering a public street; (2) Tuscaloosa maintains an easement on this land[5]; and (3) the sidewalks are indistinguishable from other sidewalks, blending in with Tuscaloosa's urban grid and not suggesting a special enclave. Mr. Keister likens his case to other cases in which courts have ruled that sidewalks, which are indistinguishable from the public landscape, are traditional public fora. See United States v. Grace, 461 U.S. 171, 180, 183 (1983) (holding that because "[t]here is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave," the public sidewalks surrounding the Supreme Court were public fora and noting that "[t]here is nothing to indicate to the public that these sidewalks are

---

[5] Because Mr. Keister pled in his Complaint that the intersection is within UA campus's bounds, we need not resolve the parties' disputes as to who maintains and owns the sidewalks at issue. What is clear is that the intersection is within UA's campus and UA treats it as such, as the district court found. And that is all that matters for our purposes today. See Bloedorn, 631 F.3d at 1233 (11th Cir. 2011) ("Publicly owned or operated property does not become a public forum simply because members of the public are permitted to come and go at will. Instead, we look to the traditional uses made of the property, the government's intent and policy concerning the usage, and the presence of any special characteristics." (internal quotations and citations omitted)).

part of the Supreme Court grounds or are in any way different from other public sidewalks in the city"); McGlone v. Bell, 681 F.3d 718, 732 (6th Cir. 2012) (holding that perimeter sidewalks around Tennessee Technological University's campus were traditional public fora but noting that "Appellees have not attempted to dispute Plaintiff's characterization of the perimeter sidewalks as traditional public fora"); Brister v. Faulkner, 214 F.3d 675, 681–83 (5th Cir. 2000) (holding that the sidewalks surrounding the University of Texas at Austin's Erwin Center, which all abutted public streets, were traditional public fora as they were indistinguishable from the City of Austin's public sidewalks as the only indication that a person was entering University property was a verbal warning from a police officer).

This Court has previously provided controlling guidance on how to determine the type of forum on a public college campus. In Bloedorn, the plaintiff wished to preach on Georgia Southern University's ("GSU") campus and, when denied, filed suit asserting that GSU's speech policy violated the First Amendment. 631 F.3d at 1225–27. This Court held that GSU's sidewalks, pedestrian mall, and rotunda were limited public fora because (1) a state-funded university is not *per se* a traditional public forum[6]; and (2) there was no evidence GSU intended to open

---

[6] See Widmar v. Vincent, 454 U.S. 263, 267 n.5 (1981) ("A university differs in significant respects from public forums such as streets or parks or even municipal theaters. A university's mission is education, and decisions of this Court have never denied a university's authority to

14

those areas for public expressive conduct. Id. at 1232. By limiting who may use its facilities to a discrete group of people—the GSU community—we concluded "[t]his is precisely the definition of a limited public forum." Id.

We also held that "it is of lesser significance that the GSU sidewalks and Pedestrian Mall physically resemble municipal sidewalks and public parks. The physical characteristics of the property alone cannot dictate forum analysis." Id. at 1233. Noting that although GSU's campus possessed many features similar to public parks—such as sidewalks, pedestrian malls, and streets—we held its essential function was quite different: education. Id. at 1233–34 ("Perhaps most important, the purpose of a university is strikingly different from that of a public park. Its essential function is not to provide a forum for general public expression and assembly; rather, the university campus is an enclave created for the pursuit of higher learning by its admitted and registered students and by its faculty."). Thus, because GSU did not intend to open its sidewalks to public discourse, it was a limited public forum.

The same is true here. Mr. Keister's main argument is that the intersection's sidewalks look like Tuscaloosa sidewalks and one can walk unimpeded from the city onto campus. But this argument misses the mark. The relevant inquiry is

---

impose reasonable regulations compatible with that mission upon the use of its campus and facilities. We have not held, for example, that a campus must make all of its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings.").

15

whether UA intended to open this area up for non-student use. See United States v. Kokinda, 497 U.S. 720, 730 (1990) ("[T]he government does not create a public forum by . . . *permitting* limited discourse, but only by intentionally opening a nontraditional forum for public discourse." (quoting Cornelius, 473 U.S. at 802)). Because UA did not, our precedent dictates that the sidewalks are limited public fora.

The essential function of UA's property is congruent with its educational mission. See Widmar, 454 U.S. at 267 n.5; Bloedorn, 631 F.3d at 1233. It is entirely reasonable for UA to place some restrictions on who can speak where and when on its campus, especially with the use of a loudspeaker, while its students are attempting to learn and its faculty attempting to teach.

Further, there are objective indications that University Boulevard and Hackberry Lane are within UA's campus as opposed to "mere" public Tuscaloosa streets at that intersection. Unlike in Grace, where the Supreme Court held that its perimeter sidewalks were traditional public fora because they were not distinguishable from the Washington, D.C. public sidewalks, 461 U.S. at 179–80, here the intersection, as evident from the UA map, is in the heart of campus.[7] It is surrounded by UA buildings, and there are numerous permanent, visual indications that the sidewalks are on UA property including landscaping fences and UA

---

[7] Because the intersection is in the heart of campus, we need not address if our analysis would be different if the intersection were instead at the perimeter of the university's campus.

signage. While physical characteristics are not dispositive for forum analysis, they independently support a limited public forum in this case as they suggest to the intended speaker that he has entered a special enclave. See Bloedorn, 631 F.3d at 1234 (holding that because GSU's campus was clearly defined by large signs and pillars, among others, and the relevant GSU forum was inside campus, Grace was inapplicable).

Neither are we persuaded by Mr. Keister's argument that because the intersection is open as a public thoroughfare, it is *per se* a traditional public forum. As the Supreme Court held in Greer v. Spock, 424 U.S. 828 (1976), the government permitting its citizenry to access its land via sidewalks and streets does not automatically convert a nonpublic forum to a public one. Id. at 830, 835–38 (holding that although the military had allowed unimpeded civilian traffic on roads and sidewalks within a military base's unrestricted area, that access did not convert the base to a public forum); Bloedorn, 631 F.3d at 1233 ("Publicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will.") (quoting Grace, 461 U.S. at 177)).

In sum, because the intersection is within the UA campus, is not intended as an area for the public's expressive conduct, and contains markings clearly identifying it as an enclave, the district court properly determined it was a limited

17

public forum. As Mr. Keister did not challenge the district court's application of the relevant level of scrutiny, we conclude the district court did not abuse its discretion in denying Mr. Keister's preliminary injunction request.

## IV. CONCLUSION

For the reasons set out above, the district court did not abuse its discretion in denying Mr. Keister's preliminary injunction motion. As a result, we affirm.

**AFFIRMED.**

18