[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12218
_____

D.C. Docket No. 5:16-cr-00011-MTT-CHW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEVEN DEASON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(July 17, 2020)

Before BRANCH, TJOFLAT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

This is one of the many cases we see in which an adult male pedophile

communicates with and propositions an underage female via the internet only to

discover to his surprise that she is not underage and often, as in this case, not even female. Surprise is followed by arrest and prosecution, which are usually followed by conviction and appeal, which are usually followed by affirmance. So it is here.

## I.  FACTUAL BACKGROUND

Steven Deason responded by email to a Craigslist ad by someone who supposedly was a female living on Robins Air Force Base. The ad said that she was "lookin[g] to hang out wit[h] some cool guys." Deason asked "[h]ow old are you and what are you into[?]" She answered that she was 14 years old. He continued to message with her, claiming that he was 30 years old (he was actually 39). She told him her name was Amber and that she lived on base with her parents.

Deason and Amber chatted digitally (mainly on Yahoo Messenger) over a period of about a month, from January 6 to February 4, 2016. Deason quickly introduced sexual topics into their conversations. The focus of many of their conversations was sexual experiences and encounters, proposed sexual acts between the two, and a meeting so that they could engage in those acts. Deason emailed Amber pornographic images on January 12, January 15, January 19, January 22, and January 27, 2016. On February 1, he sent her three links to sexually explicit videos. The first video depicted "an older bald gentleman" and a female engaging in various sexual acts including sexual intercourse. The second

video depicted a female engaging in various sex acts with "an older, bald, white male." While it is debatable that Deason's 39 years made him "old" or "older," there is no debate that he was a "bald white male." The third video Deason sent a link to was an instructional video about masturbation for women. It, at least, did not feature an old bald man.

Amber told Deason that her parents would be out of town on February 4, and they agreed to get together at her house on that day to engage in several sexual acts, including oral sex, vaginal sex, analingus, and the like. The morning of February 4 Deason drove past the house he believed to be Amber's on his way to a Burger King to get breakfast for her. An undercover officer involved in the sting operation was there to observe. While Deason was waiting for his order to be prepared, two uniformed military police officers, who had nothing to do with the operation, happened to walk in. Shortly after they did, Deason walked out hurriedly, got into his car, sped away from the base at more than 70 m.p.h. in a 45 m.p.h. zone, and didn't go to Amber's house as he had intended.

Later that day Deason messaged Amber. After asking for her father's name, he told her that the reason he had been saying sexually explicit things and sending pornographic material to her was to help her understand that those things were wrong because she was so young. Deason told Amber that he was "trying to save" her and that he had been: "hoping all the dirty things I said to you would click in

3

your head and at some point you would say no to all of it." When Amber asked him why he would "say all that stuff for so long and do all those things," Deason told her that he had sent her all the sexually explicit messages and the porn hoping she would "tell [him] how gross it was . . . omg, an old man and a young girl." Those messages implicitly, but clearly, carried with it the incriminating admission that he had sent sexually explicit material to a girl he knew was underage.

He must have realized his slip up in that regard because he belatedly changed course. After Amber called him a liar who had broken her heart and said that she was through talking to him, he sent a couple of messages asking her if she wanted to find true love. Amber didn't respond. Deason then mentioned "role playing" for the first time, claiming to Amber that he "really thought we was [sic] role playing up until this week . . . Then I realized you was [sic] not." He told Amber not to post on Craigslist anymore because it "is dangerous" and people would "think you are role playing." He was, of course, half right: "Amber" actually was role playing.

The next day, she showed up at Deason's house in the person of Air Force Special Investigations Officer Adam Ring, an adult male, who all along had been pretending to be the underage female named Amber. He had with him several other law enforcement agents and a warrant to search Deason's cell phone. Deason agreed to talk with Ring and another agent inside his house.

4

They didn't read Deason his <u>Miranda</u> rights, preferring instead to keep the conversation non-custodial.  At the beginning of their videotaped talk with Deason, Ring told him that he was not under arrest, that he was not in custody, and that they would leave at any time he told them to go.  During their conversation, Deason confessed that he had actually believed the mythical Amber was a non-mythical fourteen-year-old girl.

## II.  PROCEDURAL HISTORY

In March 2016 a federal grand jury indicted Deason on one count of attempted online enticement of a minor in violation of 18 U.S.C. § 2422(b), and six counts of attempted transfer of obscene matter to a minor in violation of 18 U.S.C. § 1470 — one count for each of the six days he transferred obscene matter to Amber.

Deason moved to quash the six § 1470 counts or to exclude evidence of the obscene matter underlying those counts because the indictment did not specify which obscene matter was the basis of which counts.  The government responded by filing a superseding indictment that added more details to all of the § 1470 counts.  As superseded, five of the § 1470 counts (counts two through six) specified that each one was for obscene images Deason had sent Amber on one of the five specified days in January (the 12th, 15th, 19th, 22nd, and 27th), respectively.  The other § 1470 count (count seven) specified it was for the links to

5

three obscene videos that he had sent her on February 1.[1]  As a result, Deason withdrew his motion to quash the indictment or to exclude the evidence underlying the counts.

Deason also moved to suppress the videotape of the conversation that took place at his house.  He argued that the content of that conversation was not admissible because he was in custody when the interview occurred, his admissions were involuntary, and he had not been read his Miranda rights.  After holding an evidentiary hearing, the district court denied his motion.

The jury found Deason guilty on every count.  The court denied his motions for judgment of acquittal and sentenced him to 144 months on count one and 120 months on counts two through seven, to be served concurrently.

## III.  ANALYSIS

Deason contends that the district court erred by denying his motion to suppress the statements he made while being questioned in his house by Ring and the other agent.  He contends that there was insufficient evidence to convict on count seven, the one that involved the links to videos he had sent.  He contends the six counts of attempted transfer of obscene matter to a minor were flawed because each count referred to all the obscene matter transferred on a particular date

---

[1] Deason does not contest that sending a link to an obscene video is equivalent to sending an obscene video.

without listing specific items that were obscene (for example, count two stated that "on or about January 12, 2016, . . . Deason . . . did use . . . the Internet and a cellular telephone to knowingly attempt to transfer obscene matter, to-wit: e-mails [sic] containing images depicting sexual activity" to an individual he believed to be fourteen years old).  And Deason challenges for the first time: (1) the admissibility of screenshots and testimony about the three videos; (2) whether each of the counts charging attempted transfer of obscene matter to a minor improperly charged multiple crimes in a single count; and (3) whether the district court erred by failing to give the jury instructions to cure that problem.

## A.  Motion To Suppress

Everyone agrees that during the interview in his home Deason never received a Miranda warning and that he was not under arrest at any time that day. The only question is whether he was "in custody" at some point during the interview, which would have required a Miranda warning.  See Stansbury v. California, 511 U.S. 318, 322 (1994).  The only correct answer is "no."

"A defendant is in custody for the purposes of Miranda when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (quotation marks omitted).  To determine whether Deason was in "custody" during the interview we look at the totality of the circumstances and ask whether "a

reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." Id. "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." Id. And under the test, "the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." Id.

### 1.  The Interview

After it held an evidentiary hearing, the district court found these facts, none of which are disputed.

On February 5, 2016, Special Agent Ring obtained a warrant for the search and seizure of Deason's mobile phone at his house.  That same day Ring and seven other law enforcement agents went to the house in several vehicles, without lights or sirens.  As they approached his house, Deason stepped out onto his front porch. Ring and the other officers got out of their vehicles with their guns drawn but pointed at the ground in front of them, which is a defensive posture.  Every officer was in civilian clothes wearing body armor with law enforcement markings except for one, a sheriff's deputy who was in uniform.

Ring introduced himself and asked Deason if there was anyone else inside the house.  Deason said that his daughter was, Ring asked him to bring her outside, he did so, and she was placed in the deputy's vehicle.  Ring holstered his weapon

and asked Deason to come down from the porch to talk, which he did. Ring informed him that they were there to execute a search warrant for his mobile phone. Deason told him where the phone was, and the other agents went inside the house and retrieved it.

Ring offered to tell Deason about what was going on, either in his house or in one of the law enforcement vehicles. Deason chose his house. So Deason, Ring, and another law enforcement officer, Agent Agrelius, went into the house and sat at the kitchen table. They set up a video camera to record the conversation. Ring started by telling Deason he was not under arrest or in custody:

> [F]irst and foremost, the most important thing is you're not under arrest. Alright? You're not under arrest right now. We ain't got you in custody or anything like that, right? We're here in your house right now because that's where we came and that's where you are. . . . If you don't want us here then you tell us to leave and we will leave. Alright? . . . [Y]ou are not in custody, you are not detained, if you want us to leave you say the word.

Deason responded "[o]kay, okay" and "[Y]eah, I'm fine." Ring asked "You sure?" and Deason said "Yeah, I'm alright." Ring reiterated the officers' willingness to leave, saying that "anytime you want us to leave you just point to the door we will . . . bust out'a here." Deason said "Alright." Ring then asked Deason if he understood, and Deason said that he did.

Deason told the agents that he thought they were there because of his communications with someone he met on Craigslist. He claimed that he had

9

believed that he was roleplaying with someone pretending to be a child but started to worry that he was actually talking to a child. Ring pushed back on Deason's story, gradually becoming more confrontational, but eventually things cooled down. At no time did Ring or the other agent threaten Deason or indicate that he could not stop the interview at any time.

About half an hour into the conversation, Deason asked if he could have something to drink. Ring immediately responded: "You want me to get something to drink? Where's it at?" Deason pointed to the refrigerator behind Ring and told him where he could find a beverage. While Ring was looking for Deason's drink, Agent Agrelius asked Deason where his ID card was located. Deason felt in his pockets and then, leaning slightly forward in his chair, pointed behind Agrelius and stated that it was on top of the furniture he had pointed to. As he leaned forward, Agrelius told him to "stay there, stay there." Ring testified that they asked Deason to stay seated then because they "desire[d] . . . to reasonably restrain [Deason's] movement for [their] protection."

The conversation resumed and became more confrontational when Ring accused Deason of trying to cover his tracks. About forty-five minutes into the interview, Ring accused Deason of not meeting with Amber as he had intended at the Burger King because he had been spooked.

Ring told Deason that he had gotten a call from Amber's father who was frantic and that was why they were at Deason's house (which was a ruse). He also told Deason that he had read all of his chats with Amber (which was true since Ring was Amber).

Deason stuck to his story, and Ring turned the interview over to Agent Agrelius, who was more confrontational and told Deason what he thought had happened. He spoke in a sharp and firm voice and repeatedly told Deason not to interrupt him. But he never yelled at or berated Deason. He eventually got Deason to admit that he thought Amber was 14.

About an hour into the conversation, Deason's wife came home. She asked Deason why he was talking to the agents if they were not arresting him. He told her to "please go outside and let me finish talking to them" and stated "I want to finish talking to them." At that point she asked the agents to step outside of the house, and take the video camera with them, so that she could talk to her husband alone. They did what she asked. Deason tried to follow the agents outside, but his wife would not let him.

After Deason and his wife had talked alone in the house for about 15 minutes, he asked Agents Ring and Agrelius to come back inside. At that point, they handed Deason the warrant for his cell phone and told him again that he could "tell [them] to leave at any time, you're not under arrest, you're not in custody."

11

He appeared visibly dejected for the rest of their conversation.  Deason asked the two agents a few questions, Agrelius recapped what he thought had happened, and then all of the officers left.

## 2.  The Custody Question

Based on the totality of the circumstances, we agree with the district court that Deason was not in custody at any point during the interview.  Agent Ring told him several times that he was not under arrest, that he was not in custody, and that he could end the conversation at any time.  As Ring said to Deason at one point, if he wanted them to leave he could just point at the door and they would "bust out'a here."  "[T]he fact that an individual is told he is not under arrest and is free to leave is a fact of substantial importance in determining whether a reasonable person would have felt free to leave."  Brown, 441 F.3d at 1347.  Obviously.  And Deason "said he understood the officers' advice that he was not under arrest and was free to leave," which "strengthens the force of the instructions."  Id. at 1348.  Obviously.  The fact that the interview took place at the kitchen table in Deason's home is significant because "courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home."  Id. (brackets and quotation marks omitted).  Obviously.

12

The events that occurred after Deason's wife arrived also undermine his claim of involuntariness. She wanted him to shut up, but Deason would not be silenced and insisted he be allowed to finish talking to the two agents. When his wife asked the agents to leave the house and take the video equipment with them, they did so, proving by their actions that, as promised, they would leave when asked. But Deason didn't want them to leave. He tried to follow them outside and would have had his wife not stopped him.

It was Deason himself who, after talking with his wife for about a quarter of an hour, asked the agents to come back inside the house. When they complied with his request, they reminded him that he was not under arrest or in custody. It's no wonder Deason conceded in the district court that he couldn't argue in good faith that the interview was custodial at any point after the two agents left the house at his wife's request and then returned at his request.

And Deason cannot argue convincingly that a reasonable person would have believed at any time during the interview that he was not free to end it and have the agents leave. Brown, 441 F.3d at 1349. He points to the fact that eight officers came to his house — not in it, but to it — and approached his house with guns drawn. That's true, but their "weapons were pointed downward in a protective posture and were holstered shortly after the initial arrival," were never drawn again, and no officer ever handcuffed Deason or even touched him. United States

13

v. Luna-Encinas, 603 F.3d 876, 881–82 (11th Cir. 2010); see also id. (concluding defendant was not in custody despite officers first encountering him with their guns drawn in a protective posture when entering the property).

Deason also argues that "the interrogation was pointed and aggressive" and that he "was the only suspect." But "[h]is status as a suspect, and the 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect, did not automatically create a custodial situation." United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000). For safety reasons Agent Agrelius told Deason not to get up for his identification, but that does not amount to a "restraint on freedom of movement of the degree associated with a formal arrest." Brown, 441 F.3d at 1347.

Deason complains that the agents kept his eight-year-old daughter in a police car during a portion of the interview. Immediately after she was placed in the police vehicle, however, Agent Ring made clear to Deason that he was not in custody or under arrest and that he could ask the agents to leave at any time. Deason said he understood that. A reasonable person also would have understood that his daughter would be returned to the house if the agents left. (She actually was released to another family member even earlier than that, at some point during the interview.)

14

"[A] reasonable person in [Deason's] position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." Luna-Encinas, 603 F.3d at 882 (quotation marks omitted). He was interviewed in his own home, a location he preferred, and was told many times and in many ways that he was not in custody or under arrest. The voluntariness of the interview could not have been more dramatically demonstrated than it was by what happened when his wife showed up.

For all of these reasons, the district court correctly concluded that Deason was not in custody, that no Miranda warning was required, and that the motion to suppress should be denied.

## B. Proving Obscenity

Deason contends there was insufficient evidence to prove he was guilty of count seven, which charged him with attempted transfer of obscene matter to a minor in violation of 18 U.S.C. § 1470, because the government did not put into evidence the entirety of the three videos underlying that count. Instead, Agent Ring testified about the contents of each video, and screenshots from each video were admitted into evidence. That is not enough, Deason insists; the jury must have the work as a whole.

"We review de novo the sufficiency of the evidence to support a conviction, viewing the evidence in the light most favorable to the verdict and drawing all

15

reasonable inferences and credibility choices in the verdict's favor." United States v. Godwin, 765 F.3d 1306, 1319 (11th Cir. 2014) (quotation marks omitted). A guilty verdict "cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." United States v. Rodriguez, 732 F.3d 1299, 1303 (11th Cir. 2013).

The Supreme Court has set out a three-part test for the trier of fact to use in determining if matter is "obscene." Miller v. California, 413 U.S. 15, 24 (1973). The trier of fact must determine:

> (a) whether the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest, (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

Id. (quotation marks and citations omitted) (emphasis added). Two of those elements require that the work be "taken as a whole." Id.

From that requirement springs Deason's contention. He argues that the jury could evaluate the obscenity of each video "as a whole" only if it saw the whole video, not just parts of the video. He insists that screenshots and testimony about the contents of the videos were not enough for the government to carry its burden of proving beyond a reasonable doubt that the videos were obscene.

We disagree. Miller does not require that all the matter alleged to be obscene be admitted into evidence and put before the trier of fact. The "taken as a

16

whole" language in <u>Miller</u> ensures (1) that the matter is placed in context so that the jury can properly determine whether the work as a whole appeals to the prurient interest, and (2) that any serious literary, artistic, political, or scientific value present in the matter as a whole is not lost because only select portions are viewed. Still, works that are destroyed, unrecorded live performances, or works otherwise not presented in their entirety can still be found to be obscene under <u>Miller</u>. <u>See</u> <u>Paris Adult Theatre I v. Slaton</u>, 413 U.S. 49, 67 (1973) (discussing how a public sex act would not be protected by Constitution). We look at the evidence that was presented. All of it.

The evidence before the jury was sufficient to support its conviction of Deason of count seven. Agent Ring described each of the videos as a whole to the jury and his descriptions were supported by screenshots taken from the videos. The title of the first video started with "Barely Legal Teen." Ring testified about that first video as follows:

> The video . . . [is] 6 minutes and 22 seconds long. . . . [T]here was an older — older bald gentleman sitting at a table in what appeared to be some sort of a kitchen area. A female walked into the area, began to physically seduce the individual that was sitting there. The two engaged in various sexual acts and then sexual intercourse. To completion. And then the video ended.

Ring testified about the second video as follows:

> [T]hat video depicted a female that was eating a lollipop, and she encountered an older, bald, white male who began to physically seduce her. And the two engaged in various sexual acts throughout the video,

17

which was 12 minutes and 40 seconds long.  At the culmination of the video, the individual — he ejaculates onto the lollipop that the girl was consuming, and the girl continues to consume the lollipop.

Ring testified about the third video as follows:

The video was approximately 26 minutes and 25 seconds long.  The video essentially was a masturbation instructional video for females.  It showed a woman lying on a bed, not wearing any bottoms, no underwear, no pants, while there was a narration going on that described the different parts of the woman — or of the female anatomy.  It described different techniques and methods for female masturbation and was quite detailed about the effects and how to successfully masturbate as a female.

Deason has not contested the accuracy of those descriptions in Ring's testimony.

Nor has Deason argued that Agent Ring's descriptions left out important details or otherwise failed to place the matter in its proper context.  Ring's testimony and the related screenshots that the jury saw provide sufficient evidence that each of the videos "is devoted exclusively to the explicit depiction of various sexual practices[,] . . . appeals to the prurient interest and depicts sexual conduct in a patently offensive manner," and "is devoid of . . . serious value, aside from its intended commercial purpose to cater to a prurient interest in sex."  United States v. Bagnell, 679 F.2d 826, 837 (11th Cir. 1982).  There was enough evidence for the jury to find beyond a reasonable doubt that each video, taken as a whole, was obscene.[2]

---

[2] Deason notes in his opening brief to us that he argued in his motion for a judgment of acquittal before the district court "that one of the videos was not obscene and that it had

18

## C.  Specificity Issues

Deason next contends that the six counts of attempting to transfer obscene matter to a minor in violation of 18 U.S.C. § 1470 were flawed because they did not specify which of the 67 images and which of the three videos that he sent Amber the links for were alleged to be obscene.  Each § 1470 count of the superseding indictment referred to obscene matter transferred on a particular date without listing the specific items; it instead described the obscene matter as "emails containing images depicting sexual activity" or "links to videos depicting sexual activity."  For example, count two (Attempted Transfer of Obscene Matter to a Minor) states that "on or about January 12, 2016 . . . Deason . . . did use . . . the Internet and a cellular telephone, to knowingly attempt to transfer obscene matter, to-wit: e-mails [sic] containing images depicting sexual activity, to A., an individual he believed to be a fourteen (14) year old female."

---

educational value because it was an instructional video on female masturbation," but he does not otherwise press the argument.  His reply brief includes one sentence asserting that there are "legitimate arguments that the third video" is not obscene.  Because Deason did not properly present this argument on appeal, it is not properly before us.  See Keister v. Bell, 879 F.3d 1282, 1287 n.2 (11th Cir. 2018).

And as the district court noted, even if Deason is correct, there is no question that the evidence of the other two videos being obscene is sufficient to sustain his conviction on count seven.  "Courts have repeatedly held that where a statute defines two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count."  United States v. Felts, 579 F.3d 1341, 1344 (11th Cir. 2009) (quotation marks omitted).  "Proof of any one of those acts conjunctively charged may support a conviction."  Id.; see also United States v. Croteau, 819 F.3d 1293, 1308 (11th Cir. 2016) ("And here, since the indictment alleged alternative means by which Croteau violated § 7212(a), we need only find that sufficient evidence supported the jury's verdict as to any one of those means.").  In this case there is proof of two of three ways Deason is alleged to have committed the offense, so he loses.

19

An indictment is valid only if it "contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet." Russell v. United States, 369 U.S. 749, 763 (1962) (quotation marks omitted); accord United States v. Bobo, 344 F.3d 1076, 1083 (11th Cir. 2003). An indictment violates a defendant's constitutional rights if it (1) does not present the essential elements of the charged offense; (2) fails to notify the accused of the charges to be defended against; or (3) does not allow the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any future prosecutions of the same offense. Russell, 369 U.S. at 763–64 (discussing protections that the guaranty of a grand jury confers).

But if "a party invites error, the Court is precluded from reviewing that error on appeal." United States v. Brannan, 562 F.3d 1300, 1306 (11th Cir. 2009) (quotation marks omitted). The superseding indictment in this case is the result of Deason's challenge to the original indictment on specificity grounds. He did argue in his motion to quash counts two through seven of the original indictment that the six § 1470 counts in that indictment failed to identify or describe the "obscene matter" he attempted to transfer and thus violated his Fifth Amendment rights by exposing him to the risk of double jeopardy and by not sufficiently apprising him of the charges against him.

After the government secured the superseding indictment, however, Deason withdrew his motion because his trial counsel believed that the superseding indictment cured the problem. She "agree[d]" that the superseding indictment addressed the issue that she had raised and told the court that she "d[id] not have that same challenge" to the superseding indictment. She asked the Court to give her "a reasonable amount of time to review" the superseding indictment in case she had "any additional challenges to it," but she never raised any additional challenge. She never moved to quash the superseding indictment or suppress the evidence because of any problem with that indictment.

Given the statements and inactions of his counsel, if there were any problems with the specificity of the superseding indictment, Deason waived or invited the error, or he at least consented to it. See id. at 1306–07 ("[W]e are constrained to conclude that [the defendant] affirmatively waived his right to challenge the charging document on appeal because he encouraged the district court to proceed to trial on the allegedly faulty count. . . . Not only did [the defendant] fail to object to the charging instrument nor move to dismiss it, he affirmatively encouraged the district court to try this case on the very charge he thought defective.").

21

D.  Plain Error Contentions

Deason also contends that: (1) the screenshots and testimony relating to count seven, concerning the transfer of the three videos, should not have been admitted into evidence; (2) all six of the § 1470 counts improperly charged multiple crimes — an error known as duplicity; and (3) the district court erred by not giving on its own initiative jury instructions to cure the duplicity error.  None of those issues were timely raised in the district court.

Because his trial counsel didn't timely raise the issues in the district court, our review is limited to plain error.  See Fed. R. Crim. P. 52(b).  The plain error rule places a "daunting obstacle" before Deason.  United States v. Pielago, 135 F.3d 703, 708 (11th Cir. 1998).  "To demonstrate plain error, the defendant must show that there is (1) error, (2) that is plain and (3) that affects substantial rights." United States v. Turner, 474 F.3d 1265, 1276 (11th Cir. 2007) (quotation marks omitted).  "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id. (quotation marks omitted).

We exercise our discretion to notice an unpreserved error only "sparingly" and only "in those circumstances in which a miscarriage of justice would otherwise result."  United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (first

22

quoting Jones v. United States, 527 U.S. 373, 389 (1999); and then quoting United

States v. Olano, 507 U.S. 725, 736 (1993)).  The plain error test is meant to be

difficult to meet.  Id.  As we have explained:

> The narrowness of the plain error rule is a reflection of the importance, indeed necessity, of the contemporaneous objection rule to which it is an exception.  The contemporaneous objection rule fosters finality of judgment and deters "sandbagging," saving an issue for appeal in hopes of having another shot at trial if the first one misses.
>
> The contemporaneous objection rule also promotes the salutary interest of making the trial the main event.  Failure to enforce it tends to detract from the perception of the trial of a criminal case as a decisive and portentous event. Moreover, requiring timely objections allows trial courts to develop a full record on the issue, consider the matter, and correct any error before substantial judicial resources are wasted on appeal and then in an unnecessary retrial.  A full record and a prior decision in the district court are essential ingredients to our substantive review of issues—they flesh out an issue in a way the parties' briefs may not.

Pielago, 135 F.3d at 709 (cleaned up).

### 1.  Admissibility of Video Screenshots and Testimony

In order to prove Deason guilty of count seven (attempting to transfer the

links to three obscene videos to a minor in violation of § 1470), the government

put into evidence screenshots from each of those three videos and had Agent Ring

describe the content of each video to the jury.  Deason argues that under the best

evidence rule, which "requires the production of originals to prove the content of

any writing, recording or photograph," each of the videos should have been

admitted in its entirety.  United States v. Guevara, 894 F.3d 1301, 1309 (11th Cir.

23

2018) (citing Fed. R. Evid. 1002).  He also argues the district court erred in ruling that the screenshots and testimony describing the videos were admissible under Federal Rule of Evidence 1006, which allows the admission of summaries to prove the content of voluminous materials; Deason argues that the videos were not actually voluminous.  And he argues that Ring's descriptions amounted to improper lay opinion testimony both because Ring had no personal knowledge of the videos (despite having seen them) and because his testimony was not helpful to the jury.  As we have explained, we review only for plain error because Deason did not raise any of those objections at trial.  See Fed. R. Crim. P. 52(b).

Even if Deason is correct that admitting the screenshots and allowing Ring to testify about the content of the videos was error under the best evidence rule, or was error under Rule 1006, or was improper lay opinion testimony, he still cannot establish the third element of plain error review: that the error affected his substantial rights.

For an error to have affected a defendant's substantial rights, a defendant must establish that it had a "'substantial influence' on the outcome of [his] case" or that there is "'grave doubt' as to whether [it] affected the outcome of [his] case." Turner, 474 F.3d at 1276 (quoting United States v. Frazier, 387 F.3d 1244, 1268 n.20 (11th Cir. 2004) (en banc)).  He has to show that the error caused him prejudice, which means that there is a reasonable probability of a different result if

the error had not been committed.  See Molina-Martinez v. United States, 136 S. Ct. 1338, 1343 (2016) (holding that to establish an error affects substantial rights a defendant ordinarily must "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different") (quotation marks omitted). The defendant bears the "burden of persuasion" on that requirement.  Olano, 507 U.S. at 734.

Deason has not carried that burden.  Had he actually objected to admission of the screenshots and testimony about the contents of the videos, and had the district court sustained those objections and avoided the asserted error, the government would have simply put the three videos themselves into evidence. There is no question that they were admissible.  Indeed, Deason's arguments are based on the premise that the three videos *were* admissible in their entirety.  He does not actually argue that there is a reasonable probability that the jury would have reached a different result had it watched each video in its entirety instead of considering only the evidence that was admitted about each video.  Because Deason has not established a reasonable probability of a different result but for the district court's alleged error in admitting screenshots of the videos and Ring's testimony about them, he has not carried his burden of showing that the alleged error affected his substantial rights, and his failure to object is not to be forgiven under the plain error rule.  See Rodriguez, 398 F.3d at 1299.  His argument fails.

25

## 2.  Duplicitous Counts

Deason contends that the six counts in the superseding indictment charging him with attempting to transfer obscene matter to a minor in violation of § 1470 are duplicitous and should have been struck for that reason.  A count is duplicitous if it charges two or more separate and distinct offenses.  United States v. Schlei, 122 F.3d 944, 977 (11th Cir. 1997).  In criminal pleading duplicity creates the risk that: "(1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence."  Id.  (quotation marks omitted).  Because of Deason's failure to object, our review is again only for plain error.  United States v. Gonzalez, 834 F.3d 1206, 1217–18 (11th Cir. 2016).

Deason argues that an "allowable unit of prosecution" under § 1470 does not include all the images a defendant transferred or all the videos he sent the links for in a given day (which is how the six counts for attempting to transfer obscene matter organized the charges), and for that reason those counts were duplicitous.  See Ward v. United States, 694 F.2d 654, 659 (11th Cir. 1983).  To determine if a count is duplicitous we consider "what conduct constitutes a single offense."  Schlei, 122 F.3d at 977.  And to do that we look to the text of the underlying

26

statute.  See Sanabria v. United States, 437 U.S. 54, 69 (1978).  The statute behind

these counts provides:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, knowingly transfers obscene matter to another individual who has not attained the age of 16 years, knowing that such other individual has not attained the age of 16 years, or attempts to do so, shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 1470.  Deason argues that because the transfer of a single image or the

link to a single video is a crime under § 1470, it must follow that the transfer of

multiple images or of links to multiple videos constitutes multiple crimes even if

done on the same day.  And from that proposition, he says, it must follow that a

count charging multiple transfers in one day is duplicitous.

The sole risk Deason identifies from how these counts were charged is that

the jury may not have been unanimous in its findings of which transferred images

or linked videos were obscene.  For each § 1470 count there were multiple images

or video links.  For example, count two involved 28 images — so Deason theorizes

that some jurors might have concluded that only Image 1 was obscene, while

others might have concluded that only Image 2 was obscene, and so on.  Because

of that, he could have been found guilty of count two even if the jury did not

unanimously agree that any one of the 28 images in that count was obscene.  The

same alleged problem exists for the other § 1470 counts.

Even if we assume that Deason is correct, and that the § 1470 counts were duplicitous and that this error was plain, he still is not entitled to have his convictions on those counts vacated.  As with his earlier asserted errors, this asserted error is not a structural one, so he must establish that it affected his substantial rights.  See Neder v. United States, 527 U.S. 1, 8 (1999).[3]  For an error to affect a defendant's substantial rights, he must show that the error caused him prejudice, which requires that there be a reasonable probability of a different result if the error had not been committed.  See Molina-Martinez, 136 S. Ct. at 1343.  And, again, Deason bears the "burden of persuasion" on that.  Olano, 507 U.S. at 734.

A duplicitous count could have affected Deason's substantial rights only if there was a reasonable probability that the jury did not unanimously agree that any one image in a particular count was obscene.  See Rodriguez, 398 F.3d at 1301.  But as to the 67 images underlying counts two through six, Deason offers not a single argument as to how a reasonable juror could conclude that any of those

---

[3] A structural error is a defect so severe that it "infect[s] the entire trial process" and "render[s] a trial fundamentally unfair."  Neder v. United States, 527 U.S. 1, 8 (1999) (quotation marks omitted).  Examples include being completely deprived of counsel or being tried by a biased judge.  Id. at 9. The Supreme Court has made clear that "most constitutional errors can be harmless" and that there is a "strong presumption that . . . errors that may have occurred are subject to harmless-error analysis."  Id. at 8 (quotation marks omitted).  A duplicitous indictment is not one of a "very limited class of cases" that constitute a structural error.  Id. (quotation marks omitted); see also United States v. Prescott, 42 F.3d 1165, 1166–67 (8th Cir. 1994) (denying new trial despite conceded duplicity).

images are not obscene.  As to the three linked videos underlying count seven, he does not contest that two of them are obscene.  Even if we assume the third video is not obscene, see supra page 18 n.2, the jury could not have reasonably concluded that the other two videos are not obscene.  Deason has failed to offer any reasonable theory for how the jury could have been less than unanimous on at least one image or linked video underlying each of the six § 1470 counts.

Because the evidence shows that every reasonable jury would have unanimously concluded that at least one of the emails or linked videos underlying each § 1470 count was obscene, Deason has not carried his burden of showing prejudice.  He speculates that the jury might have not been unanimous, but speculation is not enough.  See Rodriguez, 398 F.3d at 1301.  He must show a "reasonable probability that the result [of the trial] would have been different but for the error."  Id.  And that different result, obviously, has to be one that would be favorable to him.  See id. at 1302.

Deason has failed to show that he would have been better off if the "duplicitous" count error had not occurred or had been corrected.  In fact, under his theory, he should have been charged not with seven § 1470 counts but with 70 counts (67 obscene emails and three linked obscene videos).  And he has offered no serious argument that he is innocent of 69 of those charges.  If it is at least as

29

plausible that an error, if one occurred, worked in the defendant's favor as against him, he loses. See id. at 1301.  That is the situation here.

The lack of prejudice here stands in stark contrast to cases such as United States v. Adkinson, 135 F.3d 1363 (11th Cir. 1998).  That case involved "a 115–page, fifteen count indictment against fourteen defendants."  Id. at 1368.  Count one of that indictment was conspiracy to commit an offense against the United States under 18 U.S.C. § 371.  Id.  The indictment alleged 227 overt acts in support of that conspiracy "with no explanation of how they fit into the alleged scheme." Id. at 1376.  During the course of the trial, however, the count one conspiracy charge was dismissed.  Id. at 1370.  And that created a new problem: counts two and three of the indictment depended on an allegation of an underlying bank fraud scheme, but the only alleged scheme had been described in count one and then incorporated by reference into the later counts.  Id. at 1376.

We concluded that even if the 227 overt acts could supply the missing scheme, the jury would have been "free to pick and choose that 'scheme' from wherever they wished among the 227 overt acts."  Id. at 1377.  "Under such circumstances, the probability that the resulting verdict was not unanimous would be overwhelming."  Id. (emphasis added).  An "overwhelming" chance of a non-unanimous verdict based on 227 choices of acts without any explanation about how they fit into an alleged scheme was enough to justify reversal even under plain

30

error review.  Id.  Here, by contrast, Deason provides no evidence that the jury verdict was anything but unanimous on at least one image or linked video underlying each of the six § 1470 counts.  He has not carried his burden under the plain error rule.[4]

### 3.  Jury Instructions to Cure Duplicity Problem

Finally, Deason contends that the district court plainly erred by failing to independently give jury instructions that would have cured what he now argues are the duplicity problems of the six § 1470 counts.  He asserts that any prejudice created by the allegedly defective counts in the superseding indictment might have been cured had the district court given specific unanimity instructions as to the duplicitous counts.  See Schlei, 122 F.3d at 980.  Because of Deason's failure to object to the counts of the superseding indictment or ask for the jury instruction on unanimity he now asserts the district court should have given, the district court would have had to ferret out the potential problem itself, raise the matter, and then add to the jury instructions language that neither party requested.  Deason argues

_____

[4] Deason's reliance on United States v. Gipson, 553 F.2d 453 (5th Cir. 1977), and United States v. Schlei, 122 F.3d 944 (11th Cir. 1997), is misplaced.  In both cases the defendant objected in the district court, review was not limited to plain error, and as a result the defendant did not have the burden of showing prejudice.  Gipson, 553 F.3d at 456; Schlei, 122 F.3d at 975–76.

that his "right to a unanimous jury verdict" was violated because the court did not do that.  See United States v. Gipson, 553 F.2d 453, 459 (5th Cir. 1977).[5]

Even if the district court committed an error that was otherwise plain by not giving on its own initiative more specific instructions about a unanimous verdict, this argument of Deason's has the same lack-of-prejudice problem as his duplicitous indictment argument.  See supra Section II.D.2.  He has to carry his burden of showing that any "error affected his substantial rights, i.e., caused him prejudice."  Puckett v. United States, 556 U.S. 129, 133 (2009).  Because he has failed to do that, he cannot prevail on this issue.  See Olano, 507 U.S. at 734.

**AFFIRMED.**

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.