[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-12152

_____

RODNEY KEISTER,

Plaintiff-Appellant,

*versus*

STUART BELL,
in his official capacity as President of
the University of Alabama,
JOHN HOOKS,
in his official capacity as Chief of Police for
the University of Alabama Police Department,
MITCHELL ODOM,
individually and in his official capacity as
Police Lieutenant for the University of
Alabama Police Department,

2                 Opinion of the Court                 20-12152

Defendants-Appellees.

———————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:17-cv-00131-RDP

———————————

Before WILSON, ROSENBAUM, and ED CARNES, Circuit Judges.

ROSENBAUM, Circuit Judge:

Sidewalks have long been a part of Americana.[1]  Cultural anthropologist Margaret Mead remarked that "[a]ny town that doesn't have sidewalks doesn't love its children."  And Shel Silverstein named an entire book after his famous poem "Where the

———————————

[1] In fact, sidewalks go back much further.  Ancient Rome is a case in point. William Smith & Charles Anthon, *A School Dictionary of Greek and Roman Antiquities* 355 (Harper & Bros., 1851) https://archive.org/details/aschooldictiona00smitgoog/page/n2/mode/2up (last visited Mar. 17, 2022).  Even today, visitors to Pompeii can see remnants of sidewalks from that era. *See, e.g.,* @pompeii_sites (Official Twitter Account of Archaeological Park of Pompeii), tweet posted Mar. 10, 2021 https://twitter.com/pompeii_sites/status/1369657737592926208 (showing a photograph and explaining, "The sidewalks, just like the pedestrian crossings, were elevated . . . and they were useful for not walking on the road . . . .").

Sidewalk Ends."[2]   The significance of sidewalks was not lost on traveling evangelical preacher Plaintiff-Appellant Rodney Keister, either.  This case stems from Keister's efforts to use a sidewalk at Defendant-Appellee University of Alabama to spread the good word.

Not long after Keister set up shop on that University sidewalk, he learned that University policy required him to have a permit to engage in public speech there.  That did not suit Keister.  So he brought a 42 U.S.C. § 1983 action against University officials, alleging that the University's policy violated his First and Fourteenth Amendment rights.

Among other relief, Keister sought to preliminarily enjoin the University from enforcing its policy.  The district court denied his motion.  That precipitated Keister's first trip to our Court.  On appeal, we affirmed the district court.  We concluded, among other things, that Keister had not shown a substantial likelihood of success on the merits of his case.  More specifically, we agreed with the district court that the sidewalk in question is a limited public forum, so the University's permitting requirement needed to be only reasonable and viewpoint-neutral.  *Keister v. Bell*, 879 F.3d 1282 (11th Cir. 2018).

---

[2] Shel Silverstein, "Where the Sidewalk Ends," *Where the Sidewalk Ends* (1974).

On remand, Keister amended his complaint. After discovery, the parties filed cross-motions for summary judgment. Once again, the district court concluded that the sidewalk at the intersection is a limited public forum and upheld the University's permit policy as reasonable.

Now, on his second trip to this Court, Keister asserts that the evidence uncovered in discovery shows that the City of Tuscaloosa owns the sidewalk at issue. Consequently, he reasons, the sidewalk is a traditional public forum, and the University's permitting requirement is unconstitutional.

After careful consideration and with the benefit of oral argument—and even assuming that the City of Tuscaloosa owns the sidewalk at issue—we disagree with Keister that any facts material to our analysis have changed. So we once again conclude that the sidewalk is a limited public forum. And this time, we also review the permitting requirement. Because we find it is reasonable, we affirm the judgment of the district court.

## I.

### A.    Factual Background[3]

As a Christian evangelist, Keister believes his mission is to share his faith and beliefs with others in public spaces. Typically, he presents his message on public sidewalks and thoroughfares by passing out religious literature, preaching, and engaging passersby in one-on-one conversation. He likes speaking with college students, so he often visits college campuses to spread his message.

On March 10, 2016, Keister and a companion went to Tuscaloosa, Alabama, to disseminate their message to the students at the University of Alabama—a state-funded public University. Keister and his friend started preaching on a sidewalk next to Sixth Avenue, in the middle of campus. They were located between two school buildings, Smith and Lloyd Halls, and across from the Quad—a grassy area at the center of campus. Keister set up a banner and passed out literature, while his companion preached through a megaphone.

Soon after Keister and his friend began, campus police and a University representative approached. They informed Keister that the University's Policy for the Use of University Space, Facilities and Grounds ("Policy") required him to obtain a permit before

---

[3] We are reviewing an order granting summary judgment, so we present the evidence in the light most favorable to Keister, against whom the district court granted summary judgment. *See Rodriguez v. City of Doral*, 863 F.3d 1343, 1349 (11th Cir. 2017).

participating in expressive conduct on University grounds. According to Keister, the University representative told him that campus "is open to the public, and Keister was allowed to be there, but he could not engage in his [preferred form] of expression on [University] campus without first obtaining a permit."

After further discussion with the campus police and a University representative, Keister and his companion decided to move to the sidewalk at the northeast corner of University Boulevard and Hackberry Lane (the "Sidewalk" or "Intersection"). He chose that corner because, he says, one of the campus police officers told him, "On that corner, you're good." Keister also thought that the Sidewalk was public and not part of the University's campus.

So Keister and his companion moved to the front of Russell Hall, a University building, to continue preaching. Later that day, the weather started to turn, and they decided to leave.

That's when one of the officers who had stopped them earlier approached them again. The officer said he and the other University employees were mistaken earlier when they told Keister he could preach at the Intersection. In fact, the officer explained, Keister could not preach in front of Russell Hall without a permit. Keister claims that when he questioned the officer about the policy, the officer confirmed that Keister could not return without a permit and that, if he did, he would be arrested for trespass.

20-12152                Opinion of the Court                7

Keister wishes to go back to that spot to share his message with University students. He has not returned, though, because he worries he will be arrested.

## B.    Relevant Procedural History and Evidence

### 1.    Complaint and Preliminary Injunction

On January 25, 2017, Keister filed a complaint under 42 U.S.C. §§ 1983 and 1988 against Stuart Bell, the President of the University of Alabama; John Hooks, the Chief of Police for the University Police Department; and Mitch Odom, the University police lieutenant who stopped Keister on March 10, 2016. Keister sued all defendants in their official capacity. For this reason and for convenience, we refer to the three defendants collectively as the "University."

Keister alleged that the University's Policy violates the First Amendment's Free Speech Clause and the Fourteenth Amendment's Due Process Clause. The next day, he filed a motion for preliminary injunction seeking to prevent the University from enforcing its Grounds Use Policy. In his motion, Keister argued that the University should be enjoined from enforcing its Policy because the Intersection is a traditional public forum, and the policy fails appropriate scrutiny.

Following briefing and a hearing, the district court issued a written opinion denying Keister's injunction motion. The district court determined that the Intersection is a limited public forum, and it found that the Policy satisfied the requisite level of scrutiny.

Keister filed an interlocutory appeal. In a published opinion, we affirmed. *Keister*, 879 F.3d at 1291. We held that the Intersection is a limited public forum. *Id.* But because Keister did not raise the issue on appeal, we did not consider whether the University's Policy would survive the level of scrutiny applied to limited public forums. *Id.* at 1288 n.4. Keister filed a petition seeking rehearing en banc and a petition for a writ of certiorari with the Supreme Court. Both petitions were denied.

Back in the district court, Keister filed an amended complaint, again alleging First Amendment and Fourteenth Amendment Due Process claims. He asserted that the Intersection did not actually fall within campus bounds, but rather, was only near campus. After the University unsuccessfully moved to dismiss, the parties engaged in discovery, which produced more information on the property at issue and the University's Policy.

2.    Evidence Gleaned from Discovery

a.    The Intersection

For orientation purposes, we begin with a map of the University of Alabama. Circled in red is the Intersection (where University Boulevard and Hackberry Lane meet).



University Boulevard and Hackberry Lane are Tuscaloosa city streets that, as the map reflects, run through the University's campus. Sidewalks open to the public line both streets. The Intersection is just one block east of the University Quad. It's surrounded by clearly identified University buildings: Farrah Hall on the southwest corner of the Intersection, Gallalee Hall on the northwest corner, Russell Hall on the northeast corner, and a public park on the southeast corner. Keister, as we have mentioned, was preaching in front of Russell Hall, to which the red arrow on the map points.

Objective signs literally indicate the Intersection is on campus:  the street signs at the Intersection are embossed with the script "A" logo, and University banners adorn the streetlamps. Landscaping fences, which run throughout campus, also sit on each corner of the Intersection.  Roughly two blocks to the east, on University Boulevard, some private businesses are interspersed among University buildings.  But all the property immediately around the Intersection is University property.

The parties dispute who owns the Sidewalk at issue:  the City of Tuscaloosa or the University.[4]  Because we are reviewing an order granting the University's motion for summary judgment, we assume for purposes of our analysis Keister's contention—that the City owns the Sidewalk.

Nevertheless, Keister and the University agree that the University maintains it.  The University is responsible for clearing the sidewalks, and its police respond to incidents there.

---

[4] Keister originally alleged that the Intersection was within the University's bounds, *Keister*, 879 F.3d at 1290 n.5, but in his amended complaint, he asserted that the Intersection is near campus but not a part of it.  The evidence reflects that in 1921, the University conveyed the property on the northeast corner of the Intersection to the City of Tuscaloosa to build a hospital.  Then, in 1944, the City of Tuscaloosa granted an easement to Tuscaloosa County on the land that includes the Sidewalk for making a public street or highway. Two years later, in 1946, the City transferred the land it received in 1921 back to the University "except that portion of the above-described parcel which was conveyed by said CITY OF TUSCALOOSA and others to Tuscaloosa County for the purpose of widening the highway."

### b.    The Policy

The University's Grounds Use Policy governs when, where, and how a person not affiliated with the University may engage in public speaking on campus.  It applies to any activities or events that occur on campus grounds, including on campus sidewalks, other than "casual recreational or social activities."

According to the University's Senior Director of Facilities Operation and Grounds Use Permits, the Policy is "intended to facilitate responsible stewardship of institutional resources and to protect the safety of persons."  It is also meant to "preserv[e] the primacy of the university's teaching and research mission."

When Keister attempted to speak publicly on campus,[5] the Policy required individuals who are not affiliated with the University to (1) be sponsored by a University academic department or student organization (the "University Affiliate" requirement), and (2) apply for and obtain a Grounds Use Permit ("Permit").  Under the Policy, applications for a Permit "should" be submitted ten working days before the public-speaking engagement occurs.  The Policy set forth this aspirational waiting period to "facilitate the review by all the different University departments that have responsibility for the various aspects of an Event (e.g., tents, food service, UAPD, electrical service, etc.)."  But the Policy did not require that

---

[5] As we further explain later, *see infra* at 13, the Policy in effect during Keister's attempts to speak on campus has since been superseded.

an application be submitted ten days in advance. Nor did it make the failure to do so a basis for denial. Rather, the Policy explained that "[i]f an Event does not involve factors that require multiple University department approvals, approval may be given in as few as three (3) days, if the [Permit] form is filled out completely and accurately."

And the University's practice showed that was the case. Usually, an applicant had to wait much less time than ten days to receive a response. In 2018, for example, Permit applications were approved in an average of 4.4 days. Some months, the average was even lower. Take March 2018, for instance. That month, the University averaged only 2.9 days to approve an application. (Keister visited the University in March 2016).

The University could also approve "spontaneous" events and "counter-events" in as little as twenty-four hours. Spontaneous events concern issues that have become public knowledge within two days of the event. And counter-events are those held in response to an event for which a Permit has been issued. Keister is not claiming that his preaching and leafletting qualified as a spontaneous or counter-event.

Outside speakers who obtain a Permit and sponsorship can also seek permission to use amplification equipment. But speakers must submit these applications ten working days before use. Similarly, Permit holders may distribute printed materials (including leaflets) in conjunction with an event.

Although the University receives a fair number of Permit applications, it approves almost all of them. Nevertheless, the University may deny an application under certain, content-neutral conditions. For example, the University may deny an application if the "proposed location [for the event] is unavailable . . . because of events previously planned for that location." It may also deny an application if the event would unreasonably obstruct pedestrian or vehicular traffic or unreasonably interfere with regular academic and student activities. Applicants may challenge the denial of their applications.

In July 2020, after Keister filed a notice of appeal for this case, the University instituted a new Grounds Use Policy ("New Policy"). The New Policy still requires outside speakers to obtain a sponsorship and a permit before hosting an expressive event on campus. And it still has an exception for "casual recreational or social activities." But the New Policy does slightly change the advance notice provision and sponsorship requirement. Under the New Policy, outside speakers "are strongly encouraged" to apply for a permit at least ten business days before an event, and "at a minimum" they must apply "no less than five" business days before the event. The New Policy also requires University Affiliates who reserve campus space to "actively participate in any activity associated with that reservation."

### 3.    Summary Judgment and Appeal

Now, we return to the procedural history. After the parties completed discovery, they filed cross-motions for summary

judgment.  The district court granted the University's motion and denied Keister's.  In reaching these resolutions, the district court concluded that the Sidewalk is a limited public forum because it is "within the University's campus, is not intended as an area for the public's expressive conduct, and contains markings sufficiently identifying it as an enclave."  Then, applying the requisite level of scrutiny, the district court held that the University's Grounds Use Policy and its related requirements were reasonable and viewpoint neutral.

Keister timely appealed.  In response, the University moved to dismiss the appeal as moot based on the University's adoption of the New Policy that took effect after Keister filed his notice of appeal.  For the reasons we explain below, we conclude this appeal is not moot and address the merits.

## II.

We review *de novo* a district court's grant of summary judgment.  *Rodriguez v. City of Doral*, 863 F.3d 1343, 1349 (11th Cir. 2017).  In our review, we draw all inferences and review all evidence in the light most favorable to the non-moving party.  *Id.*

## III.

Before launching into our analysis, we take a moment to explain the organization of our discussion.  Article III of the Constitution limits our jurisdiction to "[c]ases" and "[c]ontroversies."  U.S. Const. art. III, § 2.  As relevant here, that means the plaintiff must have standing (a personal stake in the matter, *see TransUnion*

*LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021)), and the case must not be moot (it must present a live, ongoing controversy that the court may redress, *see Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc), *abrogated on other grounds by Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021))—issues we address in more detail later.

The University argues that Keister may lack standing and that this case is moot. Because these arguments concern our jurisdiction to entertain the case in the first place, we would normally consider each of them, in order, before addressing the merits. But here, the University contends that Keister does not enjoy standing only if we conclude, in our analysis of his First Amendment claim, that the Sidewalk is a limited public forum—a concept we explain more later. So understanding the University's position on Keister's standing requires knowledge of First Amendment forum analysis. For that reason, we do not consider the University's standing argument until after we identify the type of forum the sidewalk represents.

Nevertheless, and at the risk of ruining the ending, we reveal now that we conclude Keister enjoys standing. As a result, we must also address the University's mootness argument. A finding of mootness based on the University's theory that we cannot redress Keister's claims now that the University has replaced the Policy at issue would obviate the need for us to consider the merits here. So we start our analysis by examining the University's mootness argument.

A.    This case is not moot

Article III requires a "[c]ase[]" or "[c]ontrovers[y]" to exist at all times during the litigation. *Alvarez v. Smith*, 558 U.S. 87, 90–91 (2009). Our jurisdiction ceases if a case becomes moot while it pends before us. *See Flanigan's*, 868 F.3d at 1255. A case can become moot, in turn, if an event occurs that ends "any actual controversy about the plaintiff['s] particular legal rights," *Alvarez*, 558 U.S. at 91, and makes redressability by the court an impossibility.

Despite this general rule, a party cannot necessarily moot a case for injunctive relief by simply voluntarily agreeing to stop the allegedly illegal conduct. *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1282–83 (11th Cir. 2004). This voluntary-cessation exception to mootness seeks to prevent defendants from returning to their old ways while nonetheless skirting judicial review. *Id.* at 1283. But the doctrine of voluntary cessation does not apply when there is "no reasonable expectation that the voluntarily ceased activity will, in fact, actually recur after the termination of the suit." *Id.* That is so because when offending conduct ends or a law is repealed, it is not able to further injure a party in a way that an injunction is capable of redressing. *Checker Cab Operations, Inc. v. Miami-Dade Cnty.*, 899 F.3d 908, 915 (2018).

Government defendants receive the benefit of the doubt in voluntary-cessation cases: When they voluntarily stop the challenged conduct, a rebuttable presumption arises that they will not reengage in it. *Troiano*, 382 F.3d at 1283. For instance, when a government fully repeals a challenged law, a case challenging that

law is almost surely moot. *Coral Springs Street Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1331 n.9 (11th Cir. 2004). And even when a challenged law is not fully repealed, we have held that so long as the law or policy has been "unambiguously terminated," any challenge to it is moot, unless a plaintiff identifies a "reasonable basis to believe that the policy will be reinstated if the suit is terminated." *Troiano*, 382 F.3d at 1285.

Yet the government cannot always moot a case by simply changing the challenged policy or law. If a new policy leaves the challenged aspects of the old policy "substantially undisturbed," the case avoids mootness. *Naturist Soc., Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992). A change in policy will moot a case only if it "fundamentally alter[s]" the original policy so "as to render the original controversy a mere abstraction." *Id.*

Here, we need not consider whether the University's replacement of the Policy that was in place when Keister filed his suit "fundamentally altered" the original Policy.[6] Even if it did, Keister's challenge is not moot. After all, he seeks, among other relief, nominal damages for the University's past alleged violation of his First Amendment rights. Ceasing an offending policy going

---

[6] We also do not consider whether the New Policy violates the First Amendment. Because the New Policy was not enacted until after this matter was already pending on appeal, the parties did not have the opportunity in the district court to conduct discovery concerning it, and the district court did not have a chance to address it. Under these circumstances, any challenge to the New Policy is better fully developed and first considered in the district court.

forward does not redress an injury that occurred in the past. *Checker Cab Operations, Inc.*, 899 F.3d at 916. And the Supreme Court recently held in *Uzuegbunam* that, in circumstances materially indistinguishable from those here, a request for nominal damages saves a matter from becoming moot as unredressable when the plaintiff bases his claim on a completed violation of a legal right. 141 S. Ct. 792, 801–02 (2021). Because the University's adoption of the New Policy does not render the case moot, we next consider the merits of Keister's claim.

### B.    The Sidewalk at the Intersection of University Boulevard and Hackberry Lane is a limited public forum

The Free Speech Clause of the First Amendment forbids the government's enactment of laws "prohibiting the free exercise" of speech. U.S. Const. amend. I. As state-funded entities, universities like the University of Alabama are subject to the First Amendment. *Bloedorn v. Grube*, 631 F.3d 1218, 1231 (11th Cir. 2011). Nevertheless, the First Amendment does not guarantee a private speaker's right to speak publicly on all government property. *Id.* at 1230. Rather, the government, similar to a private-property owner, enjoys the power to maintain its property for a lawfully prescribed use. *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).

To determine when private speakers can use government property for public expression, we apply a "forum analysis." *Walker v. Tex. Div. Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015). The type of forum to which a government rule or

policy pertains determines the level of scrutiny we apply to that rule or policy. *See Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1224 (11th Cir. 2017). Assessing the type of forum a particular piece of government property may be requires us to consider "the traditional uses made of the property, the government's intent and policy concerning the usage, and the presence of any special characteristics." *Bloedorn*, 631 F.3d at 1233.

The Supreme Court has identified four categories of government fora: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum.[7] *Barrett*, 872 F.3d at 1224. This case presents the question of whether the Sidewalk at the Intersection is a traditional public forum or limited public forum.

A "traditional public forum" is government property that has "immemorially been held in trust for the use of the public[.]" *Walker*, 576 U.S. at 215 (cleaned up). It is government property that has "time out of mind . . . been used for purposes of assembly, communicating thoughts between citizens, and discussing public

---

[7] We discuss only the traditional public forum and the limited public forum below. But for reference, a designated public forum is "government property that has not traditionally been regarded as a public forum [but] is intentionally opened up for that purpose." *Barrett*, 872 F.3d at 1224. And a nonpublic forum is property for which the government "act[s] as a proprietor, managing its internal operations." *Id.* at 1225. The term "nonpublic forum" was once synonymous with "limited public forum," but the Supreme Court has since clarified that that the terms "limited public forum" and "nonpublic forum" delineate two distinct types of fora. *Id.*

questions." *Id.* Think fully public parks and streets, for example. Traditional-public-forum status does not reach further than its "historic confines." *Ark. Educ. Tele. Comm'n v. Forbes*, 523 U.S. 666, 678 (1998).

When we evaluate a government regulation on speech in a traditional public forum, we apply strict scrutiny. *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). That means a government entity may subject speech in a traditional public forum to a time, place, and manner restriction only if its policy is "content neutral, narrowly tailored to achieve a significant government interest, and leaves open ample alternative channels of communication." *Bloedorn*, 631 F.3d at 1231 (cleaned up).

The term "limited public forum," on the other hand, describes government property where only particular subjects may be discussed or that only certain groups may use. *Id.* In other words, a limited public forum is not "open to the public at large for discussion of any and all topics." *Barrett*, 872 F.3d at 1224. The government may exclude a speaker from a limited public forum "if he is not a member of the class of speakers for whose especial benefit the forum was created." *Bloedorn*, 631 F.3d at 1231 (quoting *Cornelius*, 473 U.S. at 806). When the forum is a limited public one, regulations on speech must be only reasonable and viewpoint neutral. *Id.* We assess reasonableness by looking to the purpose of the forum and "all the surrounding circumstances." *Id.* at 1232 (quoting *Cornelius*, 473 U.S. at 809).

The Supreme Court has recognized that universities differ from other public fora in important ways. *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981). Among other distinctions, universities have a particular mission to educate. *Id.* So when it comes to their campus and facilities, universities generally may issue reasonable regulations that are consistent with that mission. *Id.* For this reason, university public-speaking venues often qualify as limited public fora.

Despite this general rule, a college campus "will surely contain a wide variety of fora on its grounds." *Bloedorn*, 631 F.3d at 1232. To determine the type of forum at issue, we must first identify the precise piece of campus the speaker wishes to access. Our cases instruct that the "scope of the relevant forum is defined by 'the access sought by the speaker.'" *Id.* (quoting *Cornelius*, 473 U.S. at 801). Because Keister seeks to speak on only the Sidewalk at the Intersection, that is the relevant forum for our purposes.

The first time this case made an appearance in this Court, on review from the denial of the preliminary injunction, we concluded that the Sidewalk was a limited public forum. *Keister*, 879 F.3d at 1290. We reached this conclusion after applying *Bloedorn*, which we explained governs us in determining the type of forum a particular part of a university campus is. *Id.* For the reader's convenience and to lay the groundwork for explaining why the evidence garnered in discovery does not change our conclusion that the Sidewalk is a limited public forum, we again discuss *Bloedorn* and its application here.

Bloedorn, an evangelical preacher like Keister, sought to preach on Georgia Southern University's ("GSU") campus. 631 F.3d at 1225. He started speaking on a sidewalk ("Pedestrian Mall") near the rotunda and student union. *Id.* After he'd begun, a university official told him that he could not speak on campus without a permit. *Id.* at 1226–27. Bloedorn eventually filed suit, arguing that the policy violated the First Amendment. *Id.* at 1227. Ultimately, we held that GSU's Pedestrian Mall and its rotunda were a limited public forum because state-funded universities are generally not considered traditional public fora, and GSU "expressed no intention to open these areas to the general public for expressive conduct." *Id.* at 1232. We concluded that it was of "lesser significance that the GSU sidewalks and Pedestrian Mall physically resemble municipal sidewalks and public parks" because "[t]he physical characteristics of the property alone cannot dictate forum analysis." *Id.* at 1233.

In arriving at this conclusion, we noted that the Supreme Court had found sidewalks not to constitute traditional public fora in similar circumstances. We pointed out that in *Greer v. Spock*, 424 U.S. 828, 835–38 (1983), the Supreme Court concluded that the presence of sidewalks and streets within a military base did not transform the base into a traditional public forum. *Bloedorn*, 631 F.3d at 1233. And we observed that in *United States v. Kokinda*, 497 U.S. 720, 727–28 (1990) (plurality opinion), the Supreme Court held that a sidewalk running between a parking lot and a post office was not a traditional public forum—even though it looked exactly

like adjacent municipal sidewalks. *Bloedorn*, 631 F.3d at 1233. The Court reached this conclusion, we remarked, because the sidewalk there was not constructed to support expressive activity. *Id.* Rather, the government built that sidewalk only to allow postal customers to navigate between the parking lot and the post office's front door. *Kokinda*, 497 U.S. at 727.

By contrast, we distinguished GSU's sidewalks from the sidewalks at issue in *United States v. Grace*, 461 U.S. 171 (1983). In *Grace*, the Supreme Court addressed whether the sidewalks in front of its own building were a traditional public forum. The Court concluded they were. *Id.* at 180. It explained that the sidewalks were "indistinguishable from any other sidewalks in Washington, D.C.," and contained "no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds they have entered some special type of enclave." *Id.* at 179–80.

We found the opposite to be true of the sidewalks in *Bloedorn*: there, the sidewalks and Pedestrian Mall were "contained inside of the GSU campus," which had entrances "identified with large blue signs and brick pillars," buildings with "large blue signs," and parking lots with "signs restricting their use to GSU community members." 631 F.3d at 1234.

Perhaps not surprisingly, when we applied *Bloedorn* the first time Keister's case reached us, we arrived at the same conclusion about the University of Alabama Sidewalk as *Bloedorn* did for the GSU sidewalk at issue there. *Keister*, 879 F.3d at 1290–91. We

noted that, in both cases, the University did not intend to open the sidewalks for non-student use. *Id.* at 1290. In both cases, too, we identified objective indicia showing that the sidewalks were on campus, and they were distinguishable from other municipal streets, unlike the sidewalks in *Grace*. *Id.* at 1291. We pointed out, for example, in the University's case, that the Sidewalk was in the "heart" of campus and was surrounded by University buildings and "numerous, permanent, visual indications that the sidewalks are on [University] property including landscaping fences and [University] signage." *Id.* at 1291. In other words, we determined, the Sidewalk here, like GSU's at issue in *Bloedorn*, was clearly inside a special enclave—the University's campus. *Id.*

Now, after discovery, Keister argues that new facts require the conclusion that the Sidewalk is a traditional public forum. He claims that new evidence reveals that the Sidewalk is not in the "heart" of campus, after all, but rather is a simple municipal sidewalk that the City of Tuscaloosa owns. In Keister's view, city ownership renders the Sidewalk a traditional public forum as a matter of law. Keister also insists that the appearance and function of the Sidewalk confirm that it is a traditional public forum. We are not persuaded.

We begin with Keister's claim that new facts alter the analysis. In Keister's view, the Sidewalk is not a part of campus. Keister contends that campus cannot be viewed as a single, uninterrupted entity because private businesses and non-University property appear next to and among University property, so it is impossible to

locate the "heart" of campus. He also argues that the Sidewalk is not inside a "special enclave" because unlike with the sidewalks in *Bloedorn*, no signs, pillars, or other markers near the Sidewalk indicate to someone that they have entered campus. Instead, Keister contends the Sidewalk is indistinguishable from the City sidewalks adjoining it. In insisting that the Sidewalk is not a part of campus, Keister relies on *McGlone v. Bell*, 681 F.3d 718, 732 (6th Cir. 2012), and *Brister v. Faulkner*, 214 F.3d 675, 681–83 (5th Cir. 2000), where the courts found the sidewalks there to be traditional public fora.

We disagree that the expanded record warrants the conclusion that the Sidewalk here is a traditional public forum. For starters, we easily conclude that the Sidewalk where Keister wants to speak is on campus. It's just a block from the Quad—the center of campus. And it lies immediately in front of Russell Hall—home to the University's history department. Even Keister conceded during his deposition that he believed Russell Hall and the grounds in front of Russell Hall were part of the University and were maintained by it. The buildings across the street from the Sidewalk are also University buildings. On the northeast corner of the Intersection, a parking lot is explicitly limited to University-affiliated individuals. Streetlamps by the Sidewalk boast University banners, and the street signs are inscribed with the University's script "A" logo. A chain-linked fence that often surrounds the University's campus also borders the Sidewalk around the Intersection.

On top of that, the University controls and maintains the Sidewalk. It shovels snow there, and its police department is

responsible for responding to incidents on that spot.  And though we assume the City owns the Sidewalk, the evidence shows that it unambiguously granted the University permission to maintain and repair the sidewalks (including the Sidewalk) on University Boulevard.  Indeed, no evidence shows that the Sidewalk has ever been treated as anything other than part of a college campus.  In short, Keister's fact-based arguments provide no basis for altering the forum analysis from our first opinion.

Nor do his legal arguments.  Regardless of where the sidewalk may end,[8] whether a sidewalk is owned by a city has never been the beginning and end of the forum analysis.  Perhaps for this reason, Keister cites no case that stands for the proposition that sidewalks are traditional public fora *because* the government owns them.  In fact, in Keister's first appeal, we dismissed another flavor of this *per se* argument:  that "because the intersection is open as a public thoroughfare, it is *per se* a traditional public forum."  *Keister*, 879 F.3d at 1291.

Keister's claim that municipal ownership is dispositive also makes little sense in the forum-analysis context, given that the government owns all property we evaluate under that framework. *Walker*, 576 U.S. at 215 (explaining that forum analysis is used "to evaluate government restrictions on purely private speech that occurs on government property").  If government ownership were the deciding factor, then we would not need to perform forum

---

[8] *See* Silverstein, *supra*, note 2.

analysis to differentiate among different types of government property. And in any case, even if the Sidewalk were owned by the University (instead of the municipality), the University is still a public entity. So if Keister were correct, his rule would require the conclusion that the Sidewalk is a public forum even without considering whether the City owned the Sidewalk. But as we have explained, Keister is mistaken: the mere fact that the government may own the property does not determine the type of forum the property presents.

Keister's argument that the particular government owner drives the outcome of the forum analysis fails for similar reasons. To be sure, as Keister submits, the Supreme Court has held that public sidewalks that are operated by a "government proprietor" like a military base, *Greer*, 424 U.S. at 836–40, or a post office, *Kokinda*, 497 U.S. at 730, are limited public fora. And it has acknowledged in *Kokinda* that "governmental actions are subject to a lower level of First Amendment scrutiny" when the government is acting as a "proprietor, to manage its internal operations." 497 U.S. at 725 (cleaned up).

But again, the Supreme Court has not created a *per se* rule that sidewalks are traditional public fora simply because they are owned by a municipality (as opposed to a different government owner). Instead, and as we have emphasized, forum analysis requires us to consider the location, purpose, and traditional use of a piece of government property—whoever the governmental owner may be. *Bloedorn*, 631 F.3d at 1233.

Here, though we accept for purposes of this appeal that the City owns it, the Sidewalk—with its location immediately in front of and across from two University buildings—functions as a part of the University. And as we have noted, the University maintains the Sidewalk and is responsible for its upkeep. Even Keister acknowledges that the University could enforce its Policy on the Sidewalk. Given the University's control over the Sidewalk, it's the *University's* intent that matters with respect to that property. And there's no question that the University does not intend to open the Sidewalk up to unchecked expressive activity by the public at large.

Finally, Keister's reliance on the out-of-circuit cases *McGlone* and *Brister* is misplaced. In those cases, the sidewalks at issue were clearly municipal sidewalks that abutted campus. *McGlone*, for example, described them as "perimeter sidewalks" outside of campus. *McGlone*, 681 F.3d at 732–33. And *Brister* emphasized that "no indication or physical demarcation" told an individual that the sidewalks were part of the University of Texas campus and not just city sidewalks. *Brister*, 214 F.3d at 681–83. Here, though, the Sidewalk is just as unambiguously within campus. That a sprinkling of private businesses sit a few blocks east of the Intersection does not change this. Anyone approaching the Intersection from any direction encounters numerous school buildings and signage plainly signaling that they are within a college campus, and not just on a city street.

In sum, we conclude that the Sidewalk on the northeast corner of the Intersection is a limited public forum.

### C.    Keister has standing to challenge the University's Policy

The University makes its argument that Keister lacks standing contingent on our conclusion that the Sidewalk is a limited public forum.  So now that we have determined that the Sidewalk is, in fact, a limited public forum, we interrupt our merits analysis to consider Keister's standing.

Our Constitution separates legislative, executive, and judicial powers among our three corresponding branches of government, so that no one branch has too much power.  Under the separation-of-powers scheme and as we have noted, the Constitution authorizes the courts to hear only "[c]ases and [c]ontroversies." U.S. Const., Art. III.  Standing doctrine helps to identify which matters fall within those bounds.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).  To enjoy standing, a litigant must show all the following:  (1) he "suffered an injury in fact that is concrete, particularized, and actual or imminent;" (2) the defendant "likely caused" his injury; and (3) judicial relief would likely redress his injury. *TransUnion*, 141 S. Ct. at 2203.

The gist of the University's position is that, on this record, Keister's injury cannot be redressed by a favorable ruling.  More specifically, the University asserts that the determination that the Sidewalk is a limited public forum means that Keister would necessarily have to obtain a permit at some point to publicly speak

there.[9]  But Keister testified he would never apply for a permit before speaking on campus, no matter how easy the process.  Because Keister refuses to seek a permit, the University reasons, he would never be able to take advantage of any favorable decision here based on a finding that the Sidewalk is a limited public forum, so his claim is not redressable.  We disagree.

As an initial matter (and as we have pointed out), Keister seeks nominal damages to redress the injury he claims to have suffered to his First Amendment rights when University employees instructed him to stop preaching on University property.  That checks the redressability box to establish standing, since "for the purpose of Article III standing, nominal damages provide the necessary redress for a complete violation of a legal right."  *Uzuegbunam*, 141 S. Ct. at 802.  To put a finer point on it, if we conclude that the University's Policy was unreasonable for First Amendment purposes, then Keister suffered a constitutional injury when the University enforced the Policy against him on March 10, 2016.  As a result, he could obtain nominal damages, even if he never seeks a permit.

Not only that, but Keister also had standing to seek declaratory and injunctive relief.  After all, we assess standing "as of the time the complaint is filed."  *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003) (citation

---

[9] If the Sidewalk were a traditional public forum, it could be subjected to only content-neutral time, place, and manner restrictions.

and quotation marks omitted).  And when Keister filed his com-
plaint and right up until the University superseded the old Policy
with the New Policy well into this litigation, we could have en-
joined the University from enforcing its Policy if we concluded that
the Policy was unreasonable or not viewpoint neutral.  That is the
exact relief Keister sought in his amended complaint.  While the
University argues that Keister would have had to be "willing to ac-
cept a permit at some point in the future," that was not necessarily
the case before the University revised the old Policy.  Had we en-
joined the Policy, that itself was the redress Keister sought.

In short, Keister has standing to challenge the University's
Policy.

## D.    The University's Policy is constitutional

With that resolved, we return to our merits analysis.  When
we last left off, we had determined that the Sidewalk is a limited
public forum.  For that reason, the University can exclude speakers
who seek "to address a topic not encompassed within the purpose
of the forum" or who are "not a member of the class of speakers
for whose especial benefit the forum was created." *Cornelius*, 473
U.S. at 806.

But the University's power to limit expression is not bound-
less.  Rather, restrictions on speech in a limited public forum still
must be viewpoint neutral and reasonable. *Bloedorn*, 631 F.3d at
1235.  The reasonableness standard is not demanding; a restriction
on expression is reasonable even if it is not "the most reasonable or

the only reasonable limitation" on expression. *Cornelius*, 473 U.S. at 808. At a minimum, a restriction must simply be "reasonable in light of the purpose which the forum at issue serves." *Bloedorn*, 631 F.3d at 1235.

Keister challenges three aspects of the University's Policy. First, he asserts that the Policy banned leafletting, which the Supreme Court has held is not a reasonable restriction on speech in a limited public forum. Second, he contends that the Policy's exception for "casual recreational or social activities" was vague and would lead to arbitrary censorship by University officials. And third, he takes issue with the ten-working-day advance-notice requirement as unreasonable.

### 1.    Leafletting

We begin with leafletting. As it turns out, the University's Policy, in fact, allowed outside speakers to distribute leaflets if they had a Permit. A Permit, though, required a University-affiliated sponsor. Keister claims that requirement imposed an effective ban on leafletting because he could not obtain a sponsor. For its part, the University responds that requiring a Permit and sponsor for leafletting was not tantamount to a "ban," but rather a reasonable time, place, and manner restriction.

We conclude the Policy provisions on leafletting were reasonable. Courts have upheld regulations in limited public fora that require speakers to obtain permission before distributing leaflets. In *Greer*, for example, the military prohibited the distribution of

leaflets and other literature in Fort Dix without prior approval from the commanding general. 424 U.S. at 831. The Supreme Court upheld the regulation because the commanding general could deny a request for leafletting only if he believed that it would be a danger to the "loyalty, discipline or morale" of the military, and he could not do so "simply because he [did] not like [the leaflet's] contents, or because it [was] . . . even unfairly critical of government policies or officials." *Id.* at 840 (cleaned up). Though the Court recognized the possibility that a commander could, in the future, apply this requirement "irrationally, invidiously, or arbitrarily," it observed that "none of the respondents in the . . . case even submitted any material for review." *Id.*

The University used a similar permission scheme for leafletting in this case. Outside speakers who wished to distribute leaflets on campus were required to seek permission from the University by obtaining a sponsor and applying for a Permit. The University would then approve a properly submitted request for a Permit unless certain neutral and objective conditions were present. For example, the University could deny an application if the proposed location were unavailable at the time requested or if the event would interfere with regular academic and student activities.

Keister contends that the Policy's sponsor requirement in this case is more like the problematic policy in *Lee v. International Society for Krishna Consciousness, Inc.*, 505 U.S. 672 (1992), where the Court struck down a ban by the Port Authority on leafletting at New York City airports. We think not.

As Justice O'Connor explained in her concurrence in *Lee*, the Port Authority's policy laid down an absolute ban on leafletting. *Id.* at 691 (O'Connor, J., concurring in judgment). But here, the University's Policy allows leafletting—it just requires a permit. The University has more than 38,000 students and nearly 7,000 staff members for a permit-seeker to choose from to serve as an affiliate—roughly 45,000 chances to obtain a permissible sponsor. And as in *Greer*, the Policy does not allow the University to deny a permit simply because it disagrees with the content of the speaker's speech. In sum, the Policy operates similarly to the permission scheme in *Greer*.[10] And it is likewise constitutional.

### 2.     "Casual Recreational or Social Activities" Exception

Keister also asserts that the Policy's permit exception for "casual recreational or social activities" is unconstitutionally vague and violates due process. As Keister sees it, the University's answer that the terms "casual recreational or social activities" are "basic, [and] well-understood" is an "I know it when I see it approach" that gives University officials too much power to decide what falls

---

[10] Keister also cites to a nonbinding decision, *Parks v. Finan*, 385 F.3d 694 (6th Cir. 2004), to support his argument that requiring a permit for leafletting is tantamount to a ban on leafletting. But *Parks* involved a restriction on leafletting in a public forum, so it was subject to strict scrutiny. The permitting scheme here applies to a *limited* public forum and therefore need be only reasonable. In a limited public forum, the government may exclude speakers who are "not a member of the class of speakers for whose especial benefit the forum was created." *Cornelius*, 473 U.S. at 806.

within those categories and therefore invites officials to burden disfavored speech by classifying it as not recreational or casual. This argument fares no better than Keister's leafletting contention.

Under due-process principles, a law or regulation is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Unconstitutionally vague laws fail to provide "fair warning" of what the law requires, and they encourage "arbitrary and discriminatory enforcement" by giving government officials the sole ability to interpret the scope of the law. *Id.* at 108–09. The First Amendment context amplifies these concerns because an unconstitutionally vague law can chill expressive conduct by causing citizens to "steer far wider of the unlawful zone" to avoid the law's unclear boundaries. *Id.* at 109. To prevent these problems, due process "insist[s] that laws give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 108. Yet despite this concern, we do not "expect mathematical certainty from our language." *Id.* at 110.

The phrase "casual recreational and social activities" is not unconstitutionally vague. A person of ordinary intelligence understands what these terms mean. Indeed, the Policy's exception for "casual recreational and social activities" is no vaguer than the Trenton, New Jersey, ordinance in *Kovacs v. Cooper*, 336 U.S. 77 (1949), which prohibited "loud and raucous noises." And the Supreme Court upheld that ordinance. As the Court explained, though the words "loud and raucous" "are abstract words, they

have through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden." *Id.* at 79. So too with "casual recreation and social activities."

Not only that, but we do not read the phrase "casual recreational and social activities" in isolation. Rather we consider it within the context of the Policy as a whole. *See, e.g., Pine v. City of West Palm Beach*, 762 F.3d 1262, 1265 n.2, 1275 (11th Cir. 2014) (concluding that a sound ordinance that prohibited "unnecessary noise or amplified sound" was not unconstitutionally vague because, viewed within the context of the ordinance as a whole, it was clear that the phrase "prohibit[ed] only shouting and loud, raucous, or unreasonably disturbing amplified noise near health care facilities or institutions for the sick"). And the Policy's "announced purpose," *Grayned*, 408 U.S. at 112—furthering the University's education mission, responsibly allocating its scarce resources, and protecting the safety and security of the University's property and students—further informs the meaning of the phrase.

With these considerations in mind, we have no difficulty concluding that Keister's actions do not fall within the "casual recreational and social activities" exception. Keister and his companion set up a display with signs, preached with an amplifier for a time, distributed literature, and used short and loud bursts of oration to draw attention. These actions do not fall within a common-sense understanding of "casual recreational and social activities." In fact, some of these actions—leafletting and using signs—are expressly covered by the Policy and therefore explicitly do not

constitute "casual recreational or social activities." And it's obvious that preaching with an amplifier and speaking loudly for the purpose of drawing attention, by definition, can interfere with the University's educational mission by disrupting ongoing classes and school activities.

As for one-on-one conversations or prayer, as the district court noted, "[d]iscussing sports or religion while strolling through campus with a friend" does not require a permit. But Keister was not just having a conversation with a friend or quietly praying; he was using loud oration to try to engage passersby on their way to class.

Nor do we agree with Keister that *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987), requires the conclusion that the "casual recreational and social activities" exception is impermissibly vague. There, Los Angeles International Airport (the "Airport") adopted a resolution that banned all First Amendment activity. *Id.* at 574–75. The Airport tried to save the ban by arguing that "airport related" expression was excepted. *Id.* at 576. The Supreme Court rejected the Airport's argument. *Id.* It reasoned that "[m]uch nondisruptive speech—such as the wearing of a T-shirt or button that contains a political message—may not be 'airport related,' but is still protected speech even in a nonpublic forum." *Id.* And while the Court concluded that "[t]he line between airport-related speech and nonairport-related speech is, at best, murky[,]" the Airport could not have described what it believed qualified as "airport-related" speech more vaguely: "an

individual who reads a newspaper or converses with a neighbor at [the Airport] is engaged in permitted 'airport-related' activity because reading or conversing permits the traveling public to 'pass the time.'" *Id.*

The Supreme Court's holding has little application here for three reasons. First, unlike the Airport's resolution, the University's Policy does not ban all First Amendment activity; rather, it requires permitting of public-speaking events. Second, unlike with the phrase "casual recreational and social activities," which has a commonly understood meaning, the phrase "airport-related" enjoys no such common understanding, and to the extent that it carries a common meaning, that meaning is clearly overly narrow to encompass permissible speech in an airport. Third, to the extent the Airport attempted to define the term "airport-related" speech, it did so in the litigation and uniquely for purposes of the Airport resolution only. So the term "airport-related" had no common meaning. And even then, the Airport's definition—First Amendment activity that allows the traveling public to "pass the time"— was broad enough to include virtually anything, so it could not provide appropriate notice to those who wished to engage in First Amendment activity at the Airport.

But the phrase "casual recreational and social activities" requires no special definition because its meaning is sufficiently clear, especially in the context of the Policy and its purpose. A person with "ordinary intelligence" knows what kind of activities qualify as "casual recreational and social activities" and what do not. And

that is even more the case when a person considers what activities can interfere with the school setting and what will not. It is also not practical to expect a university to draft a policy of this type to identify by explicit description each and every activity that exists that requires a permit.

In a nutshell, the Policy's exception for "casual recreational and social activities" is not unconstitutionally vague, and Keister's actions clearly did not qualify for this exception.

### 3.    Advance-Notice Requirement

Finally, Keister challenges the University's advance-notice requirement. The University's Policy stated that "applicants for use of the Grounds should request permission for such use ten (10) working days prior to the Event."

Keister complains that this notice period is unreasonably long. He notes that it is much longer than the advance-notice requirements upheld in *Bloedorn* and other cases, and he asserts that the University does not have a particular reason for having such a lengthy notice period. Though Keister acknowledges that under the Policy, applications for a permit could be approved in as few as three days, he concludes that's irrelevant. According to Keister, the University is free to bar any application that is not submitted ten working days in advance because it can deny any application not "properly made."

The University responds that submitting applications ten working days in advance is "best practice" but not required. It

points out that the Policy expressly provides that Keister's application could have been approved in as few as three days because it related to a smaller event. The University also points out that Keister could have planned his trip in advance, since he does that with churches. Finally, the University argues that it had good reasons for the notice period: it needs time to make sure that a space is available and that it will not interfere with University operations, like ongoing classes in Russell Hall.

As we suggested at the preliminary-injunction stage, a ten-working-day advance notice period is likely excessive. *Keister*, 879 F.3d at 1288 n.4 ("[T]his Court does have some concerns about whether UA's 10 working day advance notice requirement would be reasonable for events that do not require multiple department approvals[.]"). Ten working days is also much longer than the advance notice periods upheld in other cases. *See Bloedorn*, 631 F.3d at 1240 (upholding a 48-hour notice requirement); *see also Bowman v. White*, 444 F.3d 967, 982 (8th Cir. 2006) (upholding a three-day notice requirement).

But the Policy did not *require* an application to be submitted ten working days before an event. Rather, it instructed that an application "should" be submitted ten days ahead of time—and even then only to "facilitate the review by all the different University departments that have responsibility for the various aspects of an Event (e.g., tents, food service, UAPD, electrical service, etc.)." In fact, this record contains no indication that the University ever construed the Policy to require a ten-day lead time.

On the contrary, under the express terms of the Policy, Keister could have submitted his application as few as three working days in advance and still obtained a permit. His simple event—standing on a sidewalk and speaking to passersby—did not involve multiple University departments. Nor did it require tents, food service, the University's police department, or electrical service—the kinds of things for which the Policy's advisory ten-day window was designed. Of course, Keister never actually applied for a Permit, but there's no basis to think the University would have taken more than three days to approve one if he had.

The cases that Keister relies on do not affect our analysis. The advance-notice provisions in both *Bloedorn* and *Bowman* applied to designated public forums, so they had to satisfy strict scrutiny. *Bloedorn*, 631 F.3d at 1240 (assessing whether the notice period was "narrowly tailored"); *Bowman*, 444 F.3d at 982 (concluding that the advance notice period was sufficiently "narrowly tailored"). But here, the University applied its advance-notice provision to a limited public forum, so the provision had to be only reasonable. Other courts have upheld a seven-day notice requirement in a limited public forum. *Sonnier v. Crain*, 613 F.3d 436, 445 (5th Cir. 2010), *opinion withdrawn in part on reh'g*, 634 F.3d 778 (5th Cir. 2011). So certainly three days—the amount of time that would have been required to process a Permit in Keister's situation—is not excessive.

And that is particularly so, given the University's reasons for requiring that waiting period. The University receives thousands

of speaking requests each year. For each speaker, the University must ensure that the space the speaker seeks is available and that the speaker will not interfere with classes or other University operations. Plus, as other courts have recognized, universities are "less able than a city or other entity . . . to deal with significant disruption on short notice." *Bowman*, 444 F.3d at 982.

The University's Policy must be reasonable, not perfect. Here, the Policy satisfies that requirement. It phrases the ten-day advance-notice period in terms of "should," not "must," and the record contains no evidence that the University has rejected an application simply because it was not submitted ten days before the event. The University's reasons for the advance-notice requirement are also reasonable, and the Sidewalk is a limited public forum. Besides this, the Policy permits the fast-tracking of a Permit if an event relates to a current issue or responds to another event. Under these circumstances, we do not think the University's three-day notice requirement is unconstitutional.

## IV.

For the reasons we have explained, we affirm the district court's entry of summary judgment. The University's motion to dismiss this appeal as moot is DENIED.

**AFFIRMED.**